Raymond H. WECHSLER, Administrative Trustee of the Towers Financial Corporation Administrative Trust, Plaintiff,

v.

HUNT HEALTH SYSTEMS, LTD., P & G Enterprises, Inc., MHTJ Investments, Inc., Esperanza Health Systems, Ltd. and Friendship, Inc., Defendants.

No. 94 Civ. 8294(PKL).

United States District Court, S.D. New York.

Aug. 11, 2004.

Gadsby Hannah LLP, Boston, MA, Daniel J. Kelly, William A. Zucker, Neil W. Salon, Leader & Berkon LLP, New York City, Joseph G. Colao, for Plaintiff.

Brooks Banker & Assocs., New York City, Brooks Banker, Jr., Todd Lawlor, Paul R. Levenson, for Defendants.

### OPINION AND ORDER

LEISURE, District Judge.

TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| **Findings of Fact** | | 390 |
| I. | *The Parties* | 391 |
| II. | *The Contract* | 392 |
| | A. *The HCP Contract* | 392 |
| | B. *The Rider* | 395 |
| | C. *The Guaranties* | 395 |
| | D. *Changes in the Contractual Relationship* | 395 |
| | 1. *The July Amendment* | 395 |
| | 2. *The September Early Termination Amendment* | 395 |
| | 3. *The Security Agreement* | 396 |
| | 4. *The September Factoring Fees Amendment* | 396 |
| | 5. *The Letter Agreement* | 396 |
| III. | *The Performance* | 397 |
| | A. *The Parties' Performance Prior to September 1992* | 397 |
| | 1. *Sale of Accounts* | 397 |
| | 2. *Payment for Accounts* | 397 |
| | 3. *Collection of Accounts* | 397 |
| | 4. *Record Keeping of Accounts* | 398 |
| | B. *The Parties' Performance After September 1992* | 399 |
| | 1. *Sale of Accounts* | 399 |
| | 2. *Payment for Accounts* | 399 |
| | 3. *Collection of Accounts* | 400 |
| | 4. *Record Keeping of Accounts* | 401 |
| | C. *Hunt Health's Distributions to Investors* | 401 |
| IV. | *The Termination* | 401 |
| V. | *The Performance Post–Termination* | 402 |
| | A. *Aftermath of the Termination* | 402 |
| | B. *Hunt Health's Attempt to Buy Back Accounts* | 402 |
| | C. *Hunt Health's Sale of Assets to Esperanza* | 403 |
| | D. *Payments Made After February 26, 1993, on Accounts Sold to Towers* | 403 |

E. Towers' Bankruptcy ............................................... 403

**Conclusions of Law** ...................................................... 403

I. Plaintiff's Breach of Contract Claim ............................... 403
 A. What Is Hunt Health's Indebtedness to Towers? ............... 404
 1. The $910,870 Advance Payments from Hunt Health to Towers as
 of February 26, 1993 ................................... 404
 a. Non–Reimbursable Accounts ...................... 405
 b. Rejected Accounts ............................... 408
 i. Accounts Coded as "Appealed" .............. 408
 ii. Accounts with no Response Within 60 or 90 Days of
 Treatment ................................. 408
 iii. Paid Accounts ............................. 410
 c. Advance Rate .................................... 411
 2. Factoring Fees ....................................... 412
 B. Does Hunt Health's Early Termination Entitle Plaintiff to Early
 Termination Damages? ....................................... 412
 C. Did Hunt Health Materially Breach? ......................... 414
 1. Hunt Health's Sale of Non–Reimbursable Accounts and Record
 Keeping ............................................. 414
 2. Hunt Health's Distributions to Investors ............. 415
 3. Hunt Health's Retention of Proceeds on Accounts It Had Sold to
 Towers .............................................. 416
 4. Hunt Health's Failure to Pay Liquidated Damages Upon
 Termination ......................................... 418
 5. Hunt Health's Sale of Assets to Esperanza ............ 418
 D. Did Towers Breach Its Collection Obligation? ............... 418
 E. What Effect Did Hunt Health's and Towers' Respective Breaches
 Have on the Parties' Performance Obligations ............... 420
 1. Plaintiff Satisfies the Elements of Breach of Contract ... 420
 a. Plaintiff's Performance ......................... 421
 b. Breach by the Defendants ........................ 422
 c. Damages ........................................ 423
 i. Advances on Non–Reimbursable and Rejected Accounts ........ 424
 ii. Factoring Fees ............................ 424
 iii. Early Termination Damages ................. 425
 2. None of Defendants' Defenses Apply To Bar Plaintiff's Recovery
 for Breach of Contract .............................. 427
 a. Failure To Mitigate ............................. 427
 b. Election ........................................ 428
 c. Executory Contract .............................. 429

II. Plaintiff's Conversion Claim ....................................... 431

III. Plaintiff's Breach of Guaranty Claim ............................... 432

IV. Defendants' Breach of Contract Claim ............................... 432

V. Attorney's Fees, Costs, and Interest ............................... 434
 A. Attorney's Fees and Costs ................................... 434
 B. Prejudgment Interest ........................................ 434

**Conclusion** ............................................................ 436

Plaintiff Raymond H. Wechsler, the administrative trustee overseeing the assets of Towers Financial Corporation ("Towers"), brings this action against Hunt

Health Systems, Ltd. ("Hunt Health") and affiliated entities for breach of contract, conversion, breach of guaranty, and fraudulent conveyance in connection with the parties' factoring agreement. From October 22, 2003, through November 4, 2003, the Court conducted a bench trial regarding the disputed issues in the case, and the parties subsequently submitted post-trial briefs further addressing those issues. Having considered the parties' post-trial submissions and the evidence presented at trial, the Court sets forth herein its find-

ings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[1]

## Findings of Fact

This case arises out of a factoring agreement between Towers and Hunt Health. The agreement set forth the terms for Hunt Health's sale, and Towers' purchase, of Hunt Health's accounts receivable. In general, the agreement provides that Hunt Health will offer to sell its Reimbursable Accounts Receivable, payable by insurance

---

1. The Court bases its findings of fact on the following: the testimony at the nine-day bench trial ("Tr."); the 125 exhibits admitted into evidence during the bench trial ("Pl. Exh." and "Defs. Exh."); and, to the extent appropriate, the fifteen prior written decisions in this case ("Wechsler,"), which include seven memorandum orders and eight opinion and orders. See Wechsler v. Hunt Health Systems, Ltd., No. 94 Civ. 8294, 2003 WL 22928735 (S.D.N.Y. Dec. 10, 2003) (denying defendants' request to admit documents after the conclusion of the trial); Wechsler, No. 94 Civ. 8294, 2003 WL 22764545 (S.D.N.Y. Nov. 21, 2003) (granting defendants' request to admit into evidence the letter of plaintiff's lawyer as a trial exhibit); Wechsler, No. 94 Civ. 8294, 2003 WL 22358807 (S.D.N.Y. Oct. 16, 2003) (addressing defendants' eight motions in limine and one motion to strike); Wechsler, 285 F.Supp.2d 343 (S.D.N.Y.2003) (denying defendants' motion to reconsider this Court's order granting plaintiff's motion to bifurcate the trial); Wechsler, No. 94 Civ. 8294, 2003 WL 22024043 (S.D.N.Y. Aug. 27, 2003) (denying defendants' motion in limine to bar plaintiff from proffering evidence relating to attorney's fees and expenses incurred before August 5, 1999); Wechsler, No. 94 Civ. 8294, 2003 WL 21998980 (S.D.N.Y. Aug. 22, 2003) (denying defendants' motion in limine for permission to draw a negative inference against plaintiff as a result of Michael Rosoff's assertion of the Fifth Amendment privilege against self-incrimination); Wechsler, No. 94 Civ. 8294, 2003 WL 21998985 (S.D.N.Y. Aug. 22, 2003) (denying defendants' motion in limine to preclude plaintiff from proffering non-Bates-stamped documents, reserving judgment on admissibility of plaintiff's non-Bates-stamped documents for trial); Wechsler, No. 94 Civ. 8294, 2003 WL 21878815 (S.D.N.Y. Aug. 8, 2003) (granting plaintiff's motion to bifurcate the trial into non-jury and jury phases); Wechsler, No. 94 Civ. 8294, 2003 WL 470330 (S.D.N.Y. Feb. 25, 2003) (addressing defendants' letter requests concerning perceived inadequacies in expert report of Andrew Peter Prague for plaintiff); Wechsler, 94 Civ. 8294, 2002 WL 31106348 (S.D.N.Y. Sept. 20, 2002) (setting amount of sanctions imposed against defendants); Wechsler, 216 F.Supp.2d 347 (S.D.N.Y.2002) (denying defendants' motion for summary judgment on public policy grounds, granting plaintiff's motion for sanctions against defendants); Wechsler, 198 F.Supp.2d 508 (S.D.N.Y.2002) (granting in part and denying in part plaintiff's renewed motion for summary judgment and plaintiff's and defendants' cross-motions to strike the affidavit of opposing witnesses); Wechsler, 186 F.Supp.2d 402 (S.D.N.Y.2002) (denying defendants' motion to reconsider parts of the Court's first summary judgment decision, granting in part defendants' motion to amend their answer nunc pro tunc, granting in part plaintiff's motion to strike sections of defendants' amended answer); Wechsler, 94 Civ. 8294, 1999 WL 672902 (S.D.N.Y. Aug. 27, 1999) (granting defendants' motion to preclude plaintiff from arguing that the letter agreement between the parties had expired prior to Hunt Health's request for a payment); Wechsler, 94 Civ. 8294, 1999 WL 397751 (S.D.N.Y. June 16, 1999) (granting in part and denying in part plaintiff's motion for summary judgment, denying defendants' motion for summary judgment, and denying plaintiff's motion to strike).

companies, to Towers. The agreement further provides that Towers, upon choosing to purchase an account of Hunt Health, will make an initial payment, or advance, to Hunt Health, in the amount of 50% of the account's Reimbursable Value. After Towers makes this initial payment, or advance, it earns a "factoring fee" from Hunt Health while that advance remains outstanding. Then, when the insurance company thereafter remits its payment for the account, Towers recoups its advance, Hunt Health receives the balance, and Towers ceases to earn its factoring fee for that account.

The parties reached this factoring agreement in July 1991, significantly amended it in September 1992, operated outside its bounds from October 1992 to February 1993, and ended it on February 26, 1993. By that date, all of Hunt Health's accounts receivable, which had a total face value of $3.5 million, had been sold to Towers. Towers' outstanding initial payments, or advances, to Hunt Health as of that date totaled $910,000. In this action plaintiff demands the return of Towers' initial payments, or advances, on the theory that the accounts receivable Hunt Health sold to Towers were bad accounts. Plaintiff also demands the payment of factoring fees owed by Hunt Health for the outstanding advances. Defendants answer that plaintiff fails to show that Hunt Health sold bad accounts to Towers, and that Towers, in any event, breached the contract first. Defendants also demand, by their counterclaim, the payment of the balance of the accounts Hunt Health sold to Towers.

## I. *The Parties*

Plaintiff is Raymond H. Wechsler. In December 1994, Wechsler was appointed the administrative trustee of Towers Financial Corp. ("Towers"), after Towers had filed a voluntary petition for bankruptcy in March 1993. Defs. Exh. 25. In August 1999, the United States Bankruptcy Court for the Southern District of New York terminated Towers administrative trust, and assigned the trust's claim against Hunt Health to Wechsler in his personal capacity. Defs. Exh. 42. Prior to its bankruptcy, Towers provided accounts receivable financing and management services for thousands of corporate and healthcare clients. Such services included the purchase and financing of accounts receivable and the collection of accounts receivable on a contractual basis for a fee. Defs. Ex. 141, at 13.

Defendants are Hunt Health Systems, Ltd. ("Hunt Health"), P & G Enterprises, Inc. ("P & G"), MHTJ Investments, Inc. ("MHTJ"), Esperanza Health Systems, Ltd. ("Esperanza"), and Friendship, Inc ("Friendship"). Hunt Health, a Texas limited partnership, was formed in 1991 to operate a drug and alcohol dependency rehabilitation center located in Hunt, Texas, doing business as La Hacienda Treatment Center ("La Hacienda"). *Wechsler*, 1999 WL 397751, at *1. La Hacienda is a 110-bed drug and alcohol treatment facility that presently employs a staff of 183 and serves roughly 80 patients each month. Tr. 111:7–20; 789:14—790:10. It is situated on roughly 35 acres and includes several buildings. Tr. 112:14–17. La Hacienda conducts, among other things, a 12–step, 28–day rehabilitation program consistent with the Alcoholics Anonymous framework. Tr. 786:23—788:20.

Hunt Health operated La Hacienda from 1991 to 1993. Tr. 747:12—748:2. During its relationship with Towers, Hunt Health was owned by P & G and MHTJ. *Wechsler*, 1999 WL 397751, at *2. P & G is a Texas corporation that was formed in 1991 to acquire an interest in Hunt Health. Tr. 123:13–15. P & G is owned by two sisters, Gail Gaines and Patricia McDon-

ough. Tr. 124:3–4. MHTJ is a Texas corporation that was formed by John L. Givens III, Anand Mehendale, Rex Thomas and Thomas Havard. *Wechsler*, 1999 WL 397751, at *2 n. 1. Hunt Health's last day of business was April 1, 1993, although it remains an entity today. Tr. 159:14–17.

On April 2, 1993, Esperanza was formed by P & G and Friendship, a company itself formed on the April 2, 1993, by Givens, Mehendale, and Thomas. *Wechsler*, 1999 WL 397751, at *3. On the day Esperanza was formed, Hunt Health agreed to sell to Esperanza certain of Hunt Health's assets in exchange for Esperanza's assumption of certain of Hunt Health's liabilities. *Wechsler*, 1999 WL 397751, at *3; Pl. Exh. 16. On April 2, 1993, Hunt Health ceased to own or operate La Hacienda, and Esperanza took over ownership of La Hacienda. Tr. 180:16—185:8; Pl. Exh. 16; *see infra* I.V.C.

## II. *The Contract*

Several writings set forth the contractual relationship between the parties.

### A. *The HCP Contract*

On July 10, 1991, Hunt Health and Towers executed an accounts receivable purchase contract (the "HCP Contract" or "HCP Agreement"). Pl. Exh. 2. The HCP Contract provides that Hunt Health will offer to sell Towers the "Reimbursable Accounts" receivable of Hunt Health, defined in paragraph 1 of the HCP Contract as "clean claim obligation[s] payable in whole or in part by a governmental entity . . . or by an insurance company or other entity approved by [Towers]." Pl. Exh. 2. The HCP Contract refers to these insurance companies, governmental entities, and other account payors as "Third Party Obligors." Pl. Exh. 2, ¶ 1. The phrase "non-Reimbursable Account" does not appear in the HCP Contract, although the parties and the Court have used this term throughout the litigation. For the pur-

poses of this opinion and order, a non-Reimbursable Account is any account receivable that does not meet the definition of a Reimbursable Account as set forth in paragraph 1 of the HCP Contract. An account, therefore, not payable at least in part by a governmental entity or insurance company is a non-Reimbursable Account.

According to paragraph 3 of the HCP Contract, the purchase price for a Reimbursable Account is 95% of the amount Towers actually recovers on the account, plus 95% of any remaining "Reimbursable Value," defined as "the amount that is represented by [Hunt Health] to be due and payable by a Third Party Obligor with respect to such Account." Pl. Exh. 2. The parties have referred to the difference between the discounted value paid by Towers and its full value as a "factoring fee."

Paragraph 3 of the HCP Contract also sets forth the method by which Towers was to pay Hunt Health for the accounts receivable. Towers' payment for purchased accounts is to occur in two installments. Pl. Exh. 2. The first installment, consisting of 50% of the Reimbursable Value of the account, is due upon purchase. Pl. Exh. 2. The remaining balance is due upon the earlier of (i) receipt by Towers of full payment on the account, (ii) 30 days from the date a third party obligor informs Towers that the account will not be paid, or (iii) 365 days after the date of purchase. Pl. Exh. 2. Upon Towers' payment of the initial installment, Hunt Health's rights, title and interest in the accounts, including Hunt Health's right to payment on the accounts, transfers to Towers. Pl. Exh. 2.

The Court has already found that Towers and Hunt Health in fact used a more refined method of payment for accounts receivable that is consistent with the contract terms set forth in Paragraph 3 of the HCP Contract. *See Wechsler*, 198 F.Supp.2d at 518 n. 11. In particular, Tow-

ers applied a "dilution factor" to the accounts Hunt Health sold to it to calculate the initial payment owed to Hunt Health. *See id.* Before signing the HCP Contract, Towers determined that 60% of the face value of the Reimbursable Accounts that were subject to the HCP Agreement were in fact collectible. *See id.* As a result of this determination, Towers advanced initial payments of 30% of the face value of accounts receivable to Hunt Health. Thirty percent of the face value of the accounts receivable is 50% of the Reimbursable Value of the accounts receivable (which is 60%), thus Towers' payments comply with the HCP Contract provisions. *See id.* Towers, therefore, obligated by paragraph 3 of the HCP Contract to make initial payments of 50% of the Reimbursable Value of accounts, paid Hunt Health 30% of the face value of each account, and thereby met its obligation. The witnesses, the parties and the Court have referred to this deduction as the "dilution factor." *See id.;* Pl. Exh. 213a, ¶ 11. As the Court has noted, the parties agree that the dilution factor did in fact exist and that it was deemed to be the calculus for the "Reimbursable Value" of the accounts receivable purchased by Towers. *See Wechsler,* 198 F.Supp.2d at 518 n. 11.

Paragraph 4 of the HCP Contract provides, among other things, that Towers' "purchase of Reimbursable Accounts ... will be evidence by [its] delivery to [Hunt Health] a list of those Accounts which [Towers is] purchasing, together with payment of the initial installment of the Purchase Price for such Accounts. Upon such delivery and payment [Hunt Health] will be deemed to have sold to [Towers] all of [Hunt Health's] rights, title and interest in such Accounts and [Towers] will become the absolute owner thereof." Pl. Exh. 2.

Paragraphs 5 and 8 of the HCP Contract set forth the parties' agreement as to which accounts receivable are eligible for sale to Towers. The Court addressed these provisions at length during the summary judgment phase of this case, finding, among other things, that they are not ambiguous. *Wechsler,* 198 F.Supp.2d 508, 516–22. Paragraph 5 sets forth the parties' agreement as to "Rejected Accounts." Pl. Exh. 2. A Rejected Account is an account receivable that fails to comply with the representations and warranties in Paragraph 8 of the HCP Contract. *Wechsler,* 198 F.Supp.2d at 518; Pl. Exh. 2. Paragraph 8 states, among other things, that when Hunt Health offers to sell accounts to Towers it represents and warrants that "the Third Party Obligors identified by [Hunt Health] as being financially obligated to pay each Account purchased by [Towers] are obligated to pay the full Reimbursable Value without dispute, reduction in amount for any reason whatsoever, offset, defense or counterclaim." *Wechsler,* 198 F.Supp.2d at 518; Pl. Exh. 2. A Rejected Account, therefore, is a Reimbursable Account that Hunt Health offers to sell to Towers that is disputed, denied, or paid by the Third Party Obligor. For example, if a patient received treatment at La Hacienda, and the patient's insurance company disputes the payment owed to Hunt Health for the treatment, then the account receivable would be a Rejected Account if Hunt Health offered to sell it to Towers. Paragraph 5 obligates Hunt Health to notify Towers "promptly of any disputes, offsets, deductions, defenses or counterclaims which are or may be asserted by a Third Party Obligor" on an account receivable offered to Towers.

Paragraph 5 of the HCP Contract sets forth the options available to Hunt Health in the event that it offers to sell to Towers a Rejected Account. Pl. Exh. 2. Upon learning of a defect in an account, Hunt Health may choose to cure the defect in the account within three days of such discovery, or to substitute one or more ac-

counts for the Rejected Account within five days of such discovery. Pl. Exh. 2. Hunt Health's failure to cure or substitute a Rejected Account gives rise to an indebtedness, or overpayment, to Towers, in the amount of the initial payments, or advances, Towers made to Hunt Health on that Rejected Account. Pl. Exh. 2; *Wechsler,* 198 F.Supp.2d at 519. This indebtedness arises automatically from the sale of a Rejected Account to Towers. *Wechsler,* 198 F.Supp.2d at 519. Formal or affirmative notice by Towers of an account becoming a Rejected Account is not a condition precedent to the genesis of an indebtedness owed to Towers by Hunt Health. *Id.* In other words, as this Court has already found, Hunt Health was indebted to Towers for the advances Towers had made on accounts receivable, as well as factoring fees associated with those advances, when the accounts failed to comply with paragraph 8. *Id.* at 522.

Paragraph 5 of the HCP Contract also sets forth the options available to Towers upon its purchase of a Rejected Account that Hunt Health has not cured or substituted. The Court has already ruled that Towers had no obligation to notify Hunt Health about a defect in an account for Hunt Health to become indebted to Towers for advances paid on that account. *Id.* at 520. Upon purchasing a Rejected Account not cured or substituted by Hunt Health, Towers could either offset the amount it advanced as an initial payment on the Rejected Account from the balance of other accounts, or it could make a demand for the repayment of the advance on the Rejected Account. *Id.;* Pl. Exh. 2. If Towers chooses the latter option, then the indebtedness owed by Hunt Health to Towers would bear 18% interest (annually) running from the date of the demand. Pl. Exh. 2. The parties and Court have at times termed the process of Towers exercising its options as a "charge back." *Wechsler,* 198 F.Supp.2d at 521.

To summarize with the Court's earlier description of the agreement between the parties,

> if an account is not paid to Towers because of a breach of the Paragraph 8 warranties, the advances made to Hunt Health represent an overpayment, or indebtedness, to Towers. Hunt Health can then choose to cure or substitute for this non-conforming account. If Hunt Health does not cure or substitute, Towers can then make a demand for payment, with an 18% interest rate running from the date of demand, or Towers can choose to offset the indebtedness from the balance of the purchase price it owes on new accounts it may purchase.

*Wechsler,* 198 F.Supp.2d at 519.

Paragraph 7 of the HCP Contract provides, among other things, that Hunt Health must forward to Towers any checks it receives for accounts Hunt Health has sold to Towers. Pl. Exh. 2. Paragraph 7 does not explicitly obligate Towers to collect the accounts it purchases from Hunt Health. The Court has already ruled, however, that plaintiff is judicially estopped from asserting that Towers had no collection obligation under the HCP Contract. *Wechsler,* 1999 WL 397751, at *10; *Wechsler,* 198 F.Supp.2d at 524. Thus, for the purposes of this case, the HCP Contract imposes a collection duty upon Towers.

Paragraph 9 of the HCP Contract provides, among other things, that Hunt Health covenants to "make a notation on [its] computer files and other physical books and records to indicate which Accounts have been sold to [Towers]." Pl. Exh. 2.

Finally, paragraph 10 of the HCP Contract includes, among other things, a merger clause, a forum selection clause, and an attorney's fees clause. Pl. Exh. 2. Paragraph 10 also sets December 31, 1994,

as the date on which Hunt Health's obligation to offer accounts for sale to Towers terminates.

### B. *The Rider*

On July 10, 1991, the same day that the parties executed the HCP Contract, the parties also executed a rider, titled "Rider A." Pl. Exh. 6. Pursuant to Rider A, Towers acquired a lien on, among other things, all of the accounts receivable of Hunt Health and proceeds thereof as collateral for any liabilities of Hunt Health to Towers resulting from the operation of the HCP Contract. Pl. Exh. 6; *Wechsler,* 1999 WL 397751, at *2. Rider A gives Towers a security interest in "all presently existing or hereafter arising or acquired accounts ... whether or not such accounts have been purchased by [Towers] under the Contract." Pl. Exh. 6. Rider A lists the events which would constitute a default by Hunt Health, such as Hunt Health's failure "to pay or perform any of the Obligations after demand by [Towers] or otherwise when due." Pl. Exh. 6. "Obligations" are defined as "all present and future debts, liabilities, obligations, interest and charges of any kind whatsoever owing by you to us in connection with the Contract, whether with respect to Rejected Accounts or otherwise." Pl. Exh. 6. Rider A states that "Upon the occurrence of an Event of Default all Obligations shall become immediately due and payable." Pl. Exh. 6.

### C. *The Guaranties*

On July 10, 1991, the same day that the parties executed the HCP Contract and Rider A, Towers executed Guaranties with MHTJ and P & G. Pl. Exhs. 3, 4. The Guaranties set forth absolute and unconditional guaranties by P & G and MHTJ of Hunt Health's obligations and liabilities to Towers, if any. Pl. Exhs. 3, 4; *Wechsler,* 198 F.Supp.2d at 511. Pursuant to the Guaranties, P & G and MHTJ are jointly and severally liable to Towers for any liabilities of Hunt Health arising under the HCP Contract. Pl. Exhs. 3, 4. The Court has already granted summary judgment in plaintiff's favor that P & G and MHTJ are jointly, severally and unconditionally liable for any liability of Hunt Health to Towers. *Wechsler,* 1999 WL 397751, at *23.

### D. *Changes in the Contractual Relationship*

The parties made several changes to their original contractual relationship.

#### 1. *The July Amendment*

On July 10, 1991, the same day that the parties executed the HCP Contract, Rider A, and the Guaranties, the parties agreed to an amendment (the "July Amendment"). Pl. Exh. 5. The July Amendment alters, among other things, Paragraph 5 of the HCP Contract, such that the interest rate Hunt Health would pay Towers for Rejected Accounts for which Towers had demanded repayment would be 18% or the lesser of the Commercial Prime Rate, as published daily in the Wall Street Journal, plus 2%. Pl. Exh. 5.

#### 2. *The September Early Termination Amendment*

On September 25, 1992, the parties executed an amendment to the HCP Contract allowing Hunt Health to elect early termination. Pl. Exh. 7; *Wechsler,* 1999 WL 397751, at *2. The Amendment provides that, in the event of such election, Hunt Health must pay for Towers liquidated damages equal to $10,000 for each month or part thereof remaining prior to the HCP Contract's original termination date. Pl. Exh. 7; *Wechsler,* 1999 WL 397751, at *2. The parties have referred at times to this amount as an early termination fee.

### 3. The Security Agreement

On September 25, 1992, the parties executed a more elaborate security agreement regarding Towers' lien on Hunt Health's assets (the "Security Agreement"). Pl. Exh. 8; *Wechsler*, 1999 WL 397751, at *2. The Security Agreement expands Towers' security interest in Hunt Health's assets and amplifies Towers' remedies in the event Hunt Health fails to perform any of the obligations in the HCP Contract, and all modifying agreements, including the Security Agreement itself. Pl. Exh. 8. The Security Agreement defines the "Secured Indebtedness" which is the subject of the Security Agreement as:

> all present and future debts and other obligations of Debtor to Secured Party (including interest, fees, charges, costs, expenses and attorneys fees), whether arising by contract, tort, guaranty, or otherwise; whether or not the advances or events creating such debts or other obligations are presently foreseen.... "Secured Indebtedness" specifically includes the obligations of Debtor under this Agreement and any indebtedness arising under the [HCP Contract].

Pl. Exh. 8, ¶ 1.

In the Security Agreement, the parties agreed to, among other things, the following terms: financial statements delivered from Hunt Health to Towers must be true, accurate and complete (Pl.Exh. 8, ¶ 23(a); *Wechsler*, 1999 WL 397751, at *5); Hunt Health will give Towers written notice of, among other things, any material adverse change in the financial condition of Hunt Health or any entity liable for any of Hunt Health's Secured Indebtedness (Pl. Exh. 8, ¶ 24; *Wechsler*, 1999 WL 397751, at *5–6); Hunt Health will give Towers notice of any condition that materially impairs the value of Hunt Health's accounts, which are referred to in the Security Agreement as "Collateral" (Pl.Exh. 8, ¶¶ 2, 5); Hunt Health will not sell, lease, transfer, assign or otherwise dispose of title or possession of any of the Collateral (Pl.Exh. 8, ¶ 8); Hunt Health will maintain detailed records of its accounts (Pl.Exh. 8, ¶ 14(a)); any materially false representation or warranty of Hunt Health discovered by Towers constitutes a default (Pl.Exh. 8, ¶ 41(c)); the cessation of Hunt Health's business constitutes a default (Pl.Exh. 8, ¶ 41(f)); upon Hunt Health's default, Towers may, among other things, exercise its lien upon and right of setoff against any monies Towers has in its possession which belong to Hunt Health for the payment of any or all of the Secured Indebtedness (Pl.Exh. 8, ¶ 42(e)).

### 4. The September Factoring Fees Amendment

Also on September 25, 1992, the parties executed an amendment to the HCP Contract that changed the method by which Towers earned factoring fees from Hunt Health. Pl. Exh. 257. The HCP Contract provided that Towers would earn a 5% factoring fee for every account that it purchased and collected. The September Factoring Fees Amendment changed this term of the parties' agreement. Pursuant to this Amendment, Towers' factoring fee instead would equal "two percent (2%) per month, or twenty-four percent (24%) per annum, of the Average Outstanding Daily Balance from Towers to [Hunt Health]." Pl. Exh. 257. In other words, rather than charging 5% for each account, pursuant to the Amendment Towers charged Hunt Health 2% each month of the total amount of outstanding initial payments that Towers had made to Hunt Health on all accounts combined.

### 5. The Letter Agreement

On September 30, 1992, Towers and Hunt Health entered into a letter agreement (the "Letter Agreement") providing

in part that "the amount of Accounts [Hunt Health] offer[s] to [Towers] under the Contract can result in maximum initial payments outstanding from Towers to Hunt [Health] of One Million ($1,000,-000.00) Dollars." Pl. Exh. 9; *see Wechsler*, 1999 WL 672902. The Letter Agreement, in other words, imposes a cap of $1,000,000 on the cumulative amount of advances outstanding at any one time from Towers to Hunt Health for accounts receivable. From Hunt Health's perspective, the most important part of the changes in the contractual relationship was Hunt Health's new entitlement to $1 million in advances from Towers. Pl. Exh. 213, ¶ 42. It was Towers' promise of this money that prompted Hunt Health to agree to the changes to the contractual relationship. *Id.*

To summarize the parties' contractual relationship, then, the factoring agreement between Towers and Hunt Health involved essentially four facets: the sale of accounts; the payment for accounts sold; the collection of accounts; and the record keeping of the accounts sold and purchased.

## III. *The Performance*

The performance of the parties from July 1991 to February 1993 consisted at times with the terms of the parties' contractual relationship, but also diverged at times from those terms.

### A. *The Parties' Performance Prior to September 1992*

The following describes the parties' performance from roughly July 1991 through September 1992.

#### 1. *Sale of Accounts*

Beginning in July 1991, approximately once a week, Hunt Health prepared a list of accounts receivable to be offered to Towers for sale. Pl. Exh. 213, ¶ 13 (Affidavit of Lori Dittmar); Tr. 814:15—815:5. Hunt Health sent additional insurance information with this list of accounts. Pl. Exh. 213, ¶ 13. These documents were then reviewed by Towers. *Id.* The accounts that Towers decided to purchase were listed on a purchase letter that Towers sent to Hunt Health a few days after receiving the list. *Id.*

#### 2. *Payment for Accounts*

Towers wired payments to Hunt Health that totaled 30% of each account it purchased, which accounted for the dilution factor discussed above. *Id.;* Tr. 814:15–23. Towers made this payment as soon as it purchased the account. Pl. Exh. 213, ¶ 13. The balance of the payment was made as Towers collected the receivable. *Id.* For its services, Towers charged Hunt Health a 5% factoring fee, discussed above, on all funds it collected on the accounts. *Id.* This fee was deducted off the top of any payment from Towers to Hunt Health on an account. *Id.* Towers also deducted from the collections its 30% initial payment. *Id.* Therefore, only after Towers had received its 5% fee and reimbursed itself for the 30% initial payment did Hunt Health receive the balance of the collections of the accounts. *Id.*

#### 3. *Collection of Accounts*

Once Towers began purchasing accounts receivable from Hunt Health in July 1991, it began collecting the payments on those accounts. "Collecting" accounts means essentially pursuing payment from a Third Party Obligor, i.e., an insurance company, for treatment given to a patient at La Hacienda. "Collecting" implies efforts made to facilitate the prompt payment of an account, and involves gathering information, contacting insurance companies, and receiving payments from insurance

companies with EOBs attached. Pl. Exh. 254, at 25–36.

Lynn McLaughlin was a collector at Towers specifically assigned to work with account receivables Towers purchased from Hunt Health to get them paid. Defs. Exh. 136, at 21:7–16; 36:1–17; Defs. Exh. 49, ¶ 133. McLaughlin and two or three other collectors worked on accounts sold to Towers by Hunt Health. Defs. Exh. 136, at 36:14—37:22. McLaughlin's work included calling insurance companies "all day long" to cause the insurance companies to pay accounts receivable sold to Towers as quickly as possible. *Id.* at 23:15—29:2. Hunt Health also employed personnel to collect on accounts receivable, including accounts sold to Towers. Tr. 771:25—773:5; *see* Pl. Exhs. 259, at 12:1–16, 213 at 13; Tr. 144:9–14; 171:15–17; 748:11–20.

Towers also retrieved checks sent by insurance companies to Hunt Health. Pl. Exh. 252, at 50:22–52:12. Towers engaged a local representative, Susan Nidever, an accountant, to pick up the checks at the Hunt post office that came in from insurance companies for accounts that Towers had purchased and to submit them to Towers. Defs. Exh. 135, at 16:22—17:6; Defs. Exh. 48, at 98. Nidever was an employee of a Texas accounting firm, Stewart T. Davis & Co. Defs. Exh. 135, at 8. Nidever picked up the checks for Hunt Health at the post office every day and then drove them to La Hacienda. Defs. Exh. 135, at 48:20—52:22. She brought with her a list, from Towers, of the accounts Towers had purchased that included the patient's name for each account. *Id.* At La Hacienda, Nidever and a person from Hunt Health would go through the mail together. *Id.* Nidever would remove the checks for accounts that Towers had purchased, make copies of the checks and record their receipt, and then send them to Towers in New York. *Id.*

Barbara Lutes Harris (formerly Barbara Gardner) also worked to monitor the inflow of payments on accounts receivable. Lutes–Harris was an accounts receivable manager employed by Towers who worked on location at Hunt Health. Pl. Exh. 259, at 6:15–20, 22:15–25. Lutes–Harris thought of her duties as those of a clerk. *Id.* at 28:11–18. Lutes–Harris performed very little collections services while stationed at Hunt Health. *Id.* at 11:24—12:7. Lutes–Harris's job was to monitor the inflow of payments on accounts receivable into Hunt Health for the purpose of making sure those monies were forwarded to Towers. *Id.* at 10:7–22, 21:5—22:6. Lutes–Harris reported daily to a Towers employee in New York, Michelle Albanese–Wanna, about the amount of the deposit Hunt Health would make to Towers based on payments it had received. *Id.* at 20:15—22:14. Lutes–Harris apparently worked in tandem with, or in place of Nidever. *Id.* at 27:1–14.

### 4. *Record Keeping of Accounts*

Paragraph 4 of the HCP Contract provides that the evidence of Towers' purchase of an account receivable from Hunt Health will be delivery by Towers of a list of those accounts it is purchasing. Paragraph 9 of the HCP Contract provides that Hunt Health will "make a notation on [its] computer files and other physical books and records to indicate which Accounts have been sold to [Towers]." Pl. Exh. 2. These provisions essentially impose record-keeping obligations on Towers and Hunt Health. Before September 1992, once a week, Towers listed on a purchase letter the accounts it had decided to purchase and sent the letter to Hunt Health. Pl. Exh. 213, ¶ 13. In addition, Nidever prepared monthly reports for Towers. Defs. Exh. 135, at 17:7–11. Nidever's reports compared Towers' accounts receivable aging report to Hunt Health's aged

listing and transaction report and noted any discrepancies between the two. *See, e.g.,* Defs. Exhs. 67, 82. Towers paid Nidever for providing the check retrieval and reporting service. *Id.* at 18:8–20; Pl. Exh. 236.

Hunt Health also maintained explanation of benefit forms, or "EOBs," in its files for its patients. Tr. 740:5–8. An EOB is a document prepared by an insurance company after it receives a claim. It indicates the dates of treatment, the amount of the claim, any discounts the insurance company has taken off, the amount paid and/or not paid and, if applicable, the reason for nonpayment. Tr. 740:9–14. Insurance companies send EOBs to the insured and the hospital. Tr. 741:4–6. Hunt Health retained these EOBs for their patient files.

B. *The Parties' Performance After September 1992*

The parties' performance changed in roughly late September or early October 1992. Defs. Exh. 135, at 74:2—76:21; Tr. 830:3–15. Nidever describes the change as a conversion to "bulk." Defs. Exh. 135, at 74:2–18.[2]

1. *Sale of Accounts*

After the conversion to bulk, the parties no longer transacted sales on an account-by-account basis. Hunt Health did not submit lists from which Towers selected certain accounts to purchase. The evidence shows that Hunt Health did not perform any selection process among its accounts to find the Reimbursable Accounts it would offer to sell to Towers. Nor did Towers sift through Hunt Health's accounts receivable and select those it would purchase. Rather, as the Court discusses below, Hunt Health had "aging account receivable reports" prepared which assembled the payment information on all of Hunt Health's accounts receivable, and the parties referred to these reports after the conversion to bulk to determine what accounts Hunt Health had sold to Towers. Pl. Exh. 213, ¶¶ 37–39.

2. *Payment for Accounts*

Towers' payments to Hunt Health changed correspondingly under the bulk

---

**2.** Defendants argue that findings about the conduct of the parties after September 1992 are barred by the Court's earlier preclusion ruling, and that plaintiff is estopped from asserting arguments based on such findings. Defendants' argument is incorrect. The two previous rulings of the Court are as follows: (1) plaintiff is judicially estopped from arguing that Towers had no collection obligation under the HCP Contract; and (2) plaintiff's responses to contention interrogatories during discovery have binding effect, such that arguments omitted in the interrogatories are precluded. These rulings are the law of the case, but lack the broad sweep ascribed to them by defendants. For example, defendants argue that any findings proposed by plaintiff about the conduct of the parties after September 1992 are precluded. The conduct of the parties, however, is the central issue in the case, without which no trial would have been necessary. Disputes about breach, material breach, excuse, waiver, and election between the parties hinge on the parties' conduct. While plaintiff is estopped from arguing that the HCP Contract did not pose a collection obligation on Towers, plaintiff is of course not estopped from putting on evidence and arguments about the conduct of the parties. As for defendants' reliance on the preclusive effect of the contention interrogatories, the Court has reviewed plaintiff's responses and finds that defendants more often than not mischaracterize, or flatly misstate, the scope of these responses. The Court finds that defendants' frequent assertion that plaintiff's proposed finding of fact or conclusion of law is barred or precluded routinely lacks merit. In those instances when a plain reading of plaintiff's responses to contention interrogatories substantiates defendants' preclusion argument, the Court takes up defendants' argument in the appropriate context below.

method. In late 1992 and early 1993, Towers advanced lump-sum payments to Hunt Health, rather than individualized payments for each account it purchased. Tr. 533:9—538:19; *see, e.g.,* Pl. Exh. 44 (account number 1350–000, reflecting payments from Towers received by La Hacienda in the February 1993 ledger report). Towers did not send payments automatically upon the purchase of accounts, but rather sent payments upon Hunt Health's request. Pl. Exh. 252, at 152:3–17. Specifically, Hunt Health wired requests for funds to Towers and Towers then wired money straight to Hunt Health's account. Tr. 819:9—820:17. By February 26, 1993, Towers had advanced a total sum of $910,870 to Hunt Health for accounts receivable it had purchased. *Wechsler,* 198 F.Supp.2d at 522–23. By this date, Hunt Health had sold to Towers all of its accounts receivable. Pl. Exh. 213, ¶ 38; Tr. 210:21–24; 871:21—877:20. The face value of all of the accounts sold as of this date was $3,556,048. Pl. Exh. 210; Tr. 255:13—256:22.

### 3. *Collection of Accounts*

Upon the conversion to bulk, Towers essentially stopped collecting on accounts receivable it had purchased. Plaintiff's position throughout the litigation has been that Towers owed Hunt Health no collection obligation by the HCP Contract. *See* Defs. Exh. 49, ¶ 161; *Wechsler,* 1999 WL 397751, at *9–10. The Court has already rejected plaintiff's position, finding that plaintiff is judicially estopped from arguing that it had no collection obligation under the HCP Contract. *Wechsler,* 1999 WL 397751, at *9–10.

In October 1992, Hunt Health entered into an agreement with Kerr Medical Billing Services, Inc. ("KMBS"), by which KMBS agreed to perform billing and collection services for Hunt Health. Pl. Exh. 11; Tr. 170:2—172:5. KMBS was formed in part by John Givens, La Hacienda's Chief Financial Officer and part owner, specifically for the purpose of billing and collecting the accounts of Hunt Health. Tr. 170:19–24; 143:21–144:8; *Wechsler,* 1999 WL 397751 at *2, n. 1; Pl. Exh. 254, at 13:3–12. This agreement took effect on or around November 16, 1992. Pl. Exh. 11. Clay Corder worked as the executive director of KMBS. Pl. Exh. 254, at 9:7–11. KMBS hired employees from Hunt Health to work on the collections, which these employees had done previously at Hunt Health. Tr. 771:9—772:2.

KMBS thereafter handled all billing for patient treatment at La Hacienda. Pl. Exh. 254, at 26:25—27:14; Tr. 760:10–12; 810:5–21. Hunt Health transferred all of the patient files located in Hunt Health's business offices to KMBS. Tr. 755:3—756:22. KMBS called insurance companies to collect on accounts, and received a fee for these services from Hunt Health. Pl. Exhs. 252, at 101:18—102:11; 254, at 29:18—29:21, 39:11–25. KMBS essentially performed all of the billing and collection services for Hunt Health's accounts receivable, including those that Hunt Health had sold to Towers. Pl. Exh. 252, at 100:18—102:12.

Under the bulk method, Towers, through its agent Nidever, picked up every check sent to Hunt Health. *Id.* at 74:23—75:9. Nidever no longer compared the incoming checks to her list of accounts purchased by Towers. *Id.* at 76:9–12. Instead, Nidever simply retrieved all of the checks, without discriminating between those that matched to an account purchased by Towers, or between those than were issued by eligible Third–Party Obligors as defined in the HCP Contract. *Id.* at 75:2–16; Tr. 210:21–24. Nidever continued to pick up checks in this manner until February 25 or 26, 1993. Tr. 828:4–13, 909:3–15.

### 4. Record Keeping of Accounts

The chief, and essentially only, record of Hunt Health's accounts receivable transacted with Towers are Hunt Health's "aging account receivable reports." Hunt Health's aging account receivable reports were prepared by Kerr Medical Billing Services ("KMBS"). Tr. 810:5—811:16. Each report lists the current balance owed on each account receivable as of the date of the report. Tr. 829:1–20. Hunt Health's aging account receivable reports for October, November and December 1992, and January 1993, do not denote which accounts belonged to Towers and which accounts did not. Pl. Exhs. 73, 74, 75, 76; Defs. Exhs. 83, 84, 85, 86; Tr. 873:14–16. The aging account receivable reports needed no denotation, in fact, because Towers had bought every account shown on the report. Pl. Exh. 213, ¶ 38; Tr. 210:21–24; 871:21—877:20. Thus, the parties knew what accounts had been sold to Towers at the end of 1992 and beginning of 1993 by referring to the aging account receivable reports provided by Hunt Health to Nidever. Pl. Exh. 213, ¶ 39.

As Towers paid Hunt Health with lump sums and retrieved all of Hunt Health's incoming checks, Nidever no longer performed account-by-account reconciliations. Defs. Exh. 135, at 76:19–21; Defs. Exh. 83. Nidever states in her October 1992 report that Hunt Health's aging account receivables report "includes all receivables outstanding." Defs. Exh. 83.

Lastly, EOBs for accounts after the conversion to bulk were sent directly to KMBS, which continued to retain those documents in patient files. Tr. 740:15–22.

### C. Hunt Health's Distributions to Investors

The Court has already granted summary judgment to plaintiff that Hunt Health's distributions totaling approxi-mately $787,712 to investors from September 1991 to February 1993 constituted a breach of the HCP Contract and, when operative, the Security Agreement. *Wechsler*, 1999 WL 397751, at *5–6. Specifically, the Court granted summary judgment to plaintiff that "the distributions violated provisions of the HCP Contract and Security Agreement (i) prohibiting transfer of assets forming part of the collateral subject to Towers' lien, and (ii) requiring notice to Towers of material changes in Hunt Health's financial position." *Wechsler*, 1999 WL 397751, at *5–6. The Court held that these violations constituted breaches of the agreements between the parties, but left unresolved whether these breaches were material.

Hunt Health's distributions to partners totaled $321,801 in 1991, $374,986 in 1992, and $89,900 in January and February of 1993. Tr. 612:23—613:5, 621:5–13, 291:1–14; Pl. Exhs. 97B, 97C, 97D. During that time, Hunt Health reported a loss of operating cash of $451,129 in 1991, $200,069 in 1992, and a gain of $160,827 in 1993. Tr. 287:7–8, 288:1–2; Pl. Exhs. 97B, 97C, 97D. The distributions to investors are not reflected in the totals for loss of operating cash. Tr. 288:16–21. Generally speaking, because of the distributions to investors, more cash was taken out of Hunt Health from 1991 through 1993 than was put into Hunt Health over that span. Tr. 308:22–23. Hunt Health operated at a net cash loss during this time.

### IV. The Termination

As of January 1993, Hunt Health had begun to make arrangements to switch to a different factoring service provider, MediMax, Inc. Tr. 177:1–17, 866:5—867:8; *Wechsler*, 1999 WL 397751, at *3. By February 22, 1993, Hunt Health expected the transfer of Towers' servicing to MediMax to occur by that Friday, February 26,

1993. Pl. Exhs. 147, 162, 163; *Wechsler,* 1999 WL 397751, at *3. On Friday, February 26, 1993, Hunt Health terminated its relationship with Towers via letter. Pl. Exh. 167; Tr. 175:11–14.

## V. *The Performance Post–Termination*

The following events, which occurred after Hunt Health's termination, pertain to this action.

### A. *Aftermath of the Termination*

Once Hunt Health terminated the contract, Nidever never returned to Hunt Health to pick up checks. Tr. 828:4–13. Lutes–Harris continued to work as Towers' on-site representative at Hunt Health until the third week of April 1993. Pl. Exh. 259, at 19:1–6. Until this time Lutes–Harris continued to list checks that came in to Hunt Health. Pl. Exh. 259, at 64:22—65:1. After February 26, 1993, Hunt Health no longer offered accounts for Towers to purchase and Towers no longer made advances. *Wechsler,* 1999 WL 397751, at *3.

### B. *Hunt Health's Attempt to Buy Back Accounts*

Shortly after Hunt Health terminated its contractual relationship with Towers by letter, representatives of Hunt Health met with representatives from Towers. Defs. Exh. 138, at 215:13—217:9, 302:7—304:14; Defs. Exh. 49, ¶¶ 215–19; Defs. Exh. 45; Pl. Exhs. 168, 172; Tr. 836:15—837:14. In particular, John Givens and Dan Perry, Hunt Health's Chief Financial Officer and attorney, respectively, traveled to New York to meet with Michael Gervais and Charles Chugerman, Towers' auditor and vice president, respectively, to try and buy back the accounts receivable Hunt Health had sold to Towers. Pl. Exh. 168; Defs. Exh. 138, at 215:13—219:9. Hunt Health sought to pay off the balance of outstanding advances on accounts sold to Towers,

and to have Towers release its lien on Hunt Health's accounts receivable.

At this meeting, Hunt Health's representatives informed Towers' representatives that they wished to buy back the accounts receivable sold to Towers. Defs. Exh. 138, at 216:1–11. Hunt Health offered a check to Towers for $877,266 during this meeting on March 3, 1993. Defs. Exh. 49, ¶ 217; Tr. 837:1–2. The parties at the meeting, however, differed over the early termination agreement, in particular over whether Hunt Health owed early termination fees to Towers, and if so, what amount was owed. Defs. Exh. 138, at 216:6–11; Pl. Exh. 172. After the meeting, on March 4, 1993, Dan Perry sent a letter to Towers "to confirm that the payoff balance of [the HCP Contract]" is $909,404.44, with factoring fees in the amount of $587.66 accumulating each day. Pl. Exh. 168. Perry continues, "Representatives of MediMax, Inc. will be contacting you regarding closing and funding of this transaction." *Id.* Towers sent a letter to Mr. Perry dated March 18, 1993, indicating that "Towers computes the outstanding balance due from [Hunt Health] to be . . . $1,126,691.44. . . . Termination of Towers' security interests will not be accomplished until receipt and clearance of funds." Def. Exh. 45. Hunt Health replied with a letter to Towers dated March 24, 1993, setting forth the substance of the dispute between the parties over early termination fees. Pl. Exh. 172.

The parties never reached an agreement, and Hunt Health never bought back its accounts. Tr. 837:15–22. The dispute over whether early termination damages are due, and if so in what amount, has remained throughout the litigation up until, and including, the bench trial. *See infra* I.B., I.E.1.c.iii.

C. *Hunt Health's Sale of Assets to Esperanza*

On April 2, 1993, P & G and Friendship formed Esperanza. On the same day, Hunt Health and Esperanza executed a written agreement whereby Hunt Health agreed to sell Esperanza certain of Hunt Health's assets in exchange for Esperanza's assumption of certain of Hunt Health's liabilities. *Wechsler,* 1999 WL 397751, at *3; The decision of Esperanza and Hunt Health to execute the agreement was made by the same persons on both sides, and Gaines and Givens executed the agreement on behalf of both entities. *Id.* As the owner of La Hacienda, Esperanza functioned exactly the same as Hunt Health had, using the same employees and facility for the same business. Tr. 190:12—191:1. "The doors opened one day and it was Hunt Health and the next day it was Esperanza." Tr. 190:25—191:2.[3]

D. *Payments Made After February 26, 1993, on Accounts Sold to Towers*

Beginning on February 26, 1993, and at all times thereafter, Hunt Health deposited into its bank account the proceeds of payments it received on accounts receivable. Pl. Exh. 213, ¶ 79; Tr. 189:3–22; Pl. Exh. 44 (Bates # 00095) (La Hacienda General Ledger indicating deposits for A/R Medical on February 26, 1993). Hunt Health's agent KMBS continued to collect accounts during 1993. Pl. Exh. 254, at 178:8—176:5. Hunt Health continued to receive checks during 1993 on accounts it had sold to Towers before termination. Pl. Exh. 210; Tr. 255:13—256:22. By December 1993, Hunt Health had received and deposited checks in the amount of $970,723 on accounts it had sold to Towers.

Pl. Exh. 210. Hunt Health did not forward these checks or otherwise set apart the proceeds in any way.

E. *Towers' Bankruptcy*

On March 26, 1993, Towers filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, and a chapter 11 trustee was subsequently appointed. *Wechsler,* 1999 WL 397751, at *3. On December 8, 1994, Towers' plan of reorganization was confirmed. Def. Exh. 49.

**Conclusions of Law**

Plaintiff brings this action for breach of contract, conversion, breach of guaranty, and fraudulent conveyance. Defendants bring a counterclaim for breach of contract. The Court separated the trial of this action into a bench phase and a jury phase. *See Wechsler,* 2003 WL 21878815, 2003 WL 22259631. These findings of fact and conclusions of law are issued upon the conclusion of the bench phase of the trial. The claims at stake at the current bench phase of the trial are plaintiff's breach of contract, conversion and breach of guaranty claims against Hunt Health, P & G, and MHTJ, and defendants' counterclaim for breach of contract. At the jury phase of the trial, scheduled to follow this bench phase, the parties will present plaintiff's fraudulent conveyance claims. Plaintiff has the burden of proving its claims by a preponderance of the evidence, and defendant has the burden of proving its counterclaim by a preponderance of the evidence.

I. *Plaintiff's Breach of Contract Claim*

██ Non-performance of a contractual duty is a breach. Restatement (Second) of Contracts § 235 (1981). The elements of a

---

**3.** As the bench trial only addresses the breach of contract and conversion claims, the Court need not consider any further evidence submitted on Hunt Health's transfer of assets to Esperanza. The issues related to Hunt Health's transfer of assets to Esperanza will be resolved at a jury trial scheduled to follow the conclusion of the bench trial.

breach of contract claim in New York are (1) the existence of a contract, (2) plaintiff's performance, (3) breach by the defendant, and (4) damages. *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996). The parties agree that a contract existed between Towers and Hunt Health, but disagree about whether the preponderance of evidence shows that Towers performed, Hunt Health breached, and damages resulted.

Much of the dispute over plaintiff's breach of contract claim and defendants' breach of contract counterclaim has been resolved by the Court during the extensive pre-trial litigation and motion practice in this case. The following issues were already resolved before the trial began: (1) an integrated contract between the parties existed; (2) Hunt Health's distributions to investors constituted a breach of the agreements between the parties; (3) Hunt Health's sale to Towers of accounts that did not comply with the HCP Contract constituted a breach of the agreements between the parties; and (4) any sale by Hunt Health to Towers of a non-Reimbursable Account gave rise to an indebtedness in the amount of Towers' advance plus factoring fees.

The pre-trial litigation has thus left essentially five issues unresolved, and the determination of plaintiff's breach of contract claim hinges on the resolution of these outstanding issues at the bench trial. The first four outstanding issues the Court addresses are: (1) what is the total indebtedness owed from Hunt Health to Towers for advances made by Towers plus factoring fees; (2) does Hunt Health's early termination on February 26, 1993, entitle plaintiff to early termination damages; (3) did Hunt Health materially breach the collected agreements between the parties; (4) did Towers breach its collection obligation owed to Hunt Health under the collected agreements. These four outstanding is-

sues encapsulate the several instances of non-performance, or breach, alleged by each side. With the resolution of these four outstanding issues in place, the Court then turns to the final outstanding issue, namely, (5) what effect did Hunt Health's breaches and Towers' breach have on the parties' performance obligations, and, ultimately, on plaintiff's breach of contract claim.

### A. What Is Hunt Health's Indebtedness to Towers?

Pursuant to the HCP Contract, Hunt Health became indebted to Towers essentially for two reasons. First, Hunt Health became indebted to Towers for advances made on accounts that did not comply with the terms of the HCP Contract, that is, accounts properly categorized as non-Reimbursable or Rejected. Second, Hunt Health became indebted to Towers for factoring fees on all of the outstanding advances made by Towers to Hunt Health.

### 1. The $910,870 Advance Payments from Hunt Health to Towers as of February 26, 1993

The Court found on summary judgment that "it is undisputed that as of February 26, 1993, the sum of advances made by Towers to Hunt Health was $910,870.38." *Wechsler*, 198 F.Supp.2d at 522. This amount represents the total of outstanding initial payments Towers had made to Hunt Health as of February 26, 1993. The Court also found that "there remains a genuine issue of material fact as to the exact *amount* of Hunt Health's indebtedness as of month end February 1993 and thereafter." *Id.* The total face value of all of Hunt Health's accounts receivable as of February 26, 1993, was $3,556,048. Hunt Health had sold all of its accounts receivable to Towers as of this date. Thus the Court must determine what portion of the

$3,556,048 face value derived from non-Reimbursable and Rejected Accounts. The Court then must determine what amount of Towers' $910,870 in advances were made on these non-Reimbursable and Rejected Accounts. This amount, plus any factoring fees, represents Hunt Health's indebtedness to Towers.

Two categories of accounts receivable give rise to indebtedness if sold from Hunt Health to Towers. First, the sale of non-Reimbursable Accounts, that is, accounts that are not clean claim obligations payable by a governmental entity or insurance company, gives rise to an indebtedness. These accounts give rise to an indebtedness when sold because they do not meet the definition of accounts eligible for sale under paragraph 1 of the HCP Contract, and thus do not meet the representations and warranties of paragraph 8(i) of the HCP Contract. For example, an account receivable payable only by the patient, and not an insurance company, is a non-Reimbursable Account that gives rise to indebtedness. Second, the sale of accounts that are disputed, denied or paid to Hunt Health by the Third Party Obligor gives rise to an indebtedness. These accounts are Rejected Accounts, and give rise to an indebtedness because they fail to comply with the representations and warranties set forth in paragraph 8(viii) of the HCP Contract.

Plaintiff contends that all of the accounts Hunt Health sold to Towers as of February 26, 1993, were non-Reimbursable or Rejected and thus that all of Towers' advances are indebtedness. Plaintiff's theory of indebtedness is encapsulated in the following testimony of its expert, Prague: "the indebtedness would be equal to 30 percent of the nonreimbursable gross accounts plus 30 percent of the disputed and denied accounts receivables, plus the amount of cash that Hunt Health—the amount of cash from patient accounts receivables that Hunt Health deposited in their checkbook that they did not pay to Towers. However, that amount is kept at the amount of the advances, and those advances are $910,970." Tr. at 476:23—477:5.

Defendants contend that none of the accounts it sold were non-Reimbursable or Rejected and thus that none of Towers' advances are indebtedness.

### a. Non–Reimbursable Accounts

The parties dispute whether any of the accounts Hunt Health sold to Towers were non-Reimbursable Accounts, i.e., accounts not payable by a governmental agency or insurance company.

Plaintiff argues that of the $3,556,048 total face value of the accounts, $1,309,248 of that total face value derived from non-Reimbursable Accounts. Plaintiff contends that this conclusion is supported by the analysis of his expert, Andrew Prague, and certain documents admitted into evidence. Prague, an accountant, analyzed the aged account receivable reports prepared by KMBS for Hunt Health. The aged account receivable reports provide a detailed, up-to-date, patient-by-patient listing of Hunt Health's accounts receivable.

The reports include a column labeled "A/T," which indicates account type. In this account type column are letters, or codes, for each patient, such as "C," "PP," "CA," "AT," and others. Pl. Exh. 76. The reports do not explain what the abbreviations stand for, or what the codes signify about the status of an account. Plaintiff submits a letter written by Clay Corder, who used the codes while working at KMBS. Pl. Exh. 178. The letter was produced by defendants to plaintiff in response to a question at the 30(b)(6) deposition of Hunt Health. *Wechsler*, 2003 WL 22358807, at *8–9. In the letter, Corder states: "It's been a long time since I've

used these codes. I could speculate on what these codes were, but below is a list of what I believe is true with some certainty." Pl. Exh. 178. Corder then lists the name signified by each code alongside the code letters. For example, next to "C" Corder writes "Commercial." Next to "AT" Corder writes "Accounts to be Billed at the AT & T Contract Rate." Next to "PP" Corder writes "Private Pay Rate." Corder's descriptions of the codes is logical, and consists with the sparse indications of the meaning of the codes at the top of each page in the aged accounts receivable reports. Pl. Exh. 76; Tr. 364:18—365:25.

Relying on Corder's description of the codes, Prague determined that certain codes signified that an account is non-Reimbursable, denied or disputed. Plaintiff states that Prague's analysis is based on "common sense and his familiarity with Hunt Health's books and records." Plaintiff's Proposed Conclusions of Fact and Law, at 9. Prague did not separate these accounts by non-Reimbursable and Rejected status, but combined these two categories. Prague thus concluded that the following categories of accounts were non-Reimbursable, denied or disputed as of the end of February 1993: "AB" ("Blue Cross Accounts that had been appealed"); "BA" ("Blue Cross Accounts that had been appealed"); "CA" ("Commercial Appeal"); "FB" ("Accounts that were scholarship" ("Free Bed")); "P" ("Patient"); "PP" ("Private Pay Rate"); "PV" ("Private Health Contract Rate"); "SA" ("PT Contract Rate"); "SC" ("Self Pay Rate"); "SP" ("Private Pay Rate"). The total face value of these categories of accounts on February 28, 1993, was $1,309,248.22. Pl. Exh. 208A.

Defendants contend that Prague's analysis is faulty and thus his conclusions are incorrect. Defendants argue that the status of an account, in particular, whether an account is non-Reimbursable or Rejected, cannot be ascertained from the account descriptions signified by the codes. Defendants note that Prague did not "independently audit" the codes, in other words, Prague did not undertake to investigate accounts to determine whether they were in fact not payable by an insurance company. Defendants contend that Prague's sole reliance on Corder's descriptions undercuts his analysis. Defendants offer an example: "Prague ... views an account billed at, for example, a self-pay rate ["SC"] as a self-pay account. Prague proffers no basis for this assumption which, on its face finds no support in the definition provided in Mr. Corder's letter. Prague provides no testimony as to why the 'rate' which an account is billed bears any relationship to whether it should be considered 'reimbursable' or 'nonreimbursable' under the HCP Contract." Defendants' Proposed Findings of Fact and Conclusions of Law, at 86–87, ¶ 58. Defendants' position is that the account codes do not have "any connection whatsoever to the HCP Agreement." *Id.* at 87, ¶ 59. Defendants also argue that Prague is not a credible witness, that Towers' books and records were more accurate than Hunt Health's books and records, and that Prague is not qualified to draw conclusions about the meanings of the codes.

The Court finds that plaintiff has shown by a preponderance of evidence that certain of the accounts receivable sold to Towers as of February 28, 1993, were non-Reimbursable. Those accounts labeled as "Private Pay Rate" ("PP" and "SP") and "Self Pay Rate" ("SC") are not Reimbursable Accounts within the definition of the HCP Contract. The accounts receivable labeled with one of these three codes as of February 28, 1993, have a face value of $421,329. The mere labeling of these accounts by KMBS, when viewed in the context of all of the labels used by KMBS,

indicates that these accounts are not payable by a governmental entity or insurance company. To make this finding, the Court relies to a certain extent on Prague's analysis, in particular on Prague's examination of the KMBS aged account receivable reports, and Prague's recategorization of the accounts from a patient-by-patient listing to an account-type by account-type listing. The Court does not rely, however, on Prague's conclusions about whether particular codes signified that an account is non-Reimbursable, disputed or denied. Rather, the Court relies on the self-evident meaning of the codes, which gives way to common sense conclusions about whether certain of Hunt Health's accounts were payable by insurance companies or the patients themselves. The coding of an account as "Self Pay Rate" and "Private Pay Rate" indicates that, more likely than not, that account is payable by the patient, rather than an insurance company. Defendants offer no evidence to the contrary, and their attacks on Prague's analysis do nothing to overcome the common sense inference that accounts labeled private pay rate and self pay rate are non-Reimbursable Accounts.

Plaintiff has not shown by a preponderance of the evidence, however, that any other categories of accounts are non-Reimbursable Accounts. Prague categorized "FB" ("Accounts that were scholarship"), "P" ("Patient"), "PV" ("Private Health Contract Rate") and "SA" ("PT Contract Rate") as non-Reimbursable Accounts. While these codes provide some evidence that the accounts they described were payable by some Third Party Obligor other than an insurance company or government entity, this evidence is minimal, and plaintiff offers no other evidence that accounts categorized under these codes were non-Reimbursable.

Defendants' attacks on Prague do not persuade the Court otherwise. The Court finds Prague's testimony credible, and helpful to the extent that Prague analyzed the detailed aged accounts receivable reports prepared by KMBS. Moreover, to the extent that Prague relies on common sense, or lay, assumptions to reach his expert accountancy conclusions, the Court simply determines itself from the evidence submitted at trial whether such assumptions are reasonable and supported by a preponderance of the evidence. Thus, for example, the Court accepts Prague's conclusion that $164,887 is non-Reimbursable, because the Court finds from its own review of the evidence submitted that self pay accounts, which total $164,887, are non-Reimbursable. Also for example, the Court rejects Prague's conclusion that $252,304 is non-Reimbursable, because the Court finds from its own review of the evidence submitted that patient accounts, which total $252,304, are Reimbursable.

Moreover, the Court is not persuaded by defendants' emphasis on plaintiff's decision not to introduce into evidence Towers' records. The Court will not speculate on the potential impact of documents not in evidence. Whether Towers kept better records than Hunt Health is irrelevant. The Court has no reason to doubt the accuracy of KMBS's detailed reports, which were prepared on Hunt Health's behalf. To the extent that defendants ask the Court to speculate about Towers' records, or plaintiff's decision not to produce Towers' records, because of any alleged discovery failure by plaintiff to produce Towers' records, the Court has already rejected this argument, see *Wechsler*, 2003 WL 22358807, at *7–8, and finds no reason to revisit this previous ruling.

The Court therefore finds that, as of February 28, 1993, self pay and private pay accounts receivable sold to Towers, which totaled $421,329, were non-Reimbursable.

#### b. *Rejected Accounts*

The parties also dispute whether any of the accounts Hunt Health sold to Towers were Rejected Accounts, i.e., accounts that were denied, disputed or paid. Plaintiff, with the support of his expert Prague, contends that there are three indicators of whether an account is a Rejected Account. First, plaintiff contends that some of the KMBS codes indicate that an account is Rejected. Second, plaintiff contends that an account for which no payment arrives within 60 days should be deemed a Rejected Account. Third, plaintiff contends that accounts for which Hunt Health received payment during 1993 became Rejected Accounts.

#### i. *Accounts Coded as "Appealed"*

As noted above, Prague merged his calculation of non-Reimbursable Accounts and Rejected Accounts as of February 28, 1993, into one sum, based upon his analysis that ten categories of accounts qualified as either non-Reimbursable, disputed or denied. As part of this analysis, Prague concluded that accounts coded as "AB" ("Blue Cross Accounts that had been appealed"), "BA" ("Blue Cross Accounts that had been appealed"), and "CA" ("Commercial Accounts that had been appealed"), were disputed accounts, and thus gave rise to an indebtedness. Defendants make the same arguments with respect to Prague's analysis of Rejected Accounts as with Prague's analysis of non-Reimbursable Accounts.

The Court finds that plaintiff has shown by a preponderance of the evidence that accounts coded "AB," "BA," and "CA" were Rejected Accounts as of February 28, 1993. The coded description of these accounts indicates that they were being appealed by the Third Party Obligor. Moreover, defendants offer no evidence to contravene the reasonable inference that accounts Corder labeled as "appealed" are in fact disputed by the payor. Because they are disputed, these accounts fail to comply with the representations and warranties in paragraph 8 of the HCP Contract. Therefore the accounts labeled "AB," "BA," and "CA," which total $624,405, are Rejected Accounts, and advances on these accounts give rise to an indebtedness.

#### ii. *Accounts with no Response Within 60 or 90 Days of Treatment*

■ Plaintiff also contends that accounts for which the Third Party Obligor did not respond within 60 days of billing are Rejected Accounts. Plaintiff contends, with the support of his expert Prague, that accounts with a face value of $1,497,830 were in fact Rejected because they were denied or disputed by the Third Party Obligor, and the evidence of this denial or dispute is the delay in payment from the Obligor.

Prague analyzed the accounts that were coded as payable and not appealed by an eligible Third Party Obligor to determine whether any were disputed or denied as of February 28, 1993. To perform this analysis, Prague selected a random sample of Hunt Health's accounts listed in its aged accounts receivable report, choosing every eleventh account for analysis. For each selected account, Prague examined the EOBs associated with the account. Reviewing each EOB, Prague recorded the last date of treatment at La Hacienda for a particular patient and the date on which the Third Party Obligor either paid or denied payment for that patient's treatment. Tr. at 369:17–21. Prague then tabulated the average time lapse between these two dates. Prague concluded "that, on the average, it took 55 days for an insurance company to make a decision [about whether to pay for a claim]." Tr. 369:25—370:1. An insurance company, in

other words, either paid or disputed a claim, on average, 55 days after the last date of treatment. Prague then reviewed the aged account receivable reports and tabulated the face value of the accounts for which no insurance company had made a payment within 60 days of the last date of treatment. This amount is $1,497,830. Because sixty days had lapsed and no payment had been received, Prague inferred that these accounts were disputed by the Third Party Obligor. Prague concluded that these accounts, which total $1,497,830, are disputed, and thus Rejected. In other words, Prague concluded that any account for which no payment had been made within 60 days must be disputed, because, on average, insurance companies either paid or disputed a claim within 55 days.

Prague also tabulated those accounts for which no payment was made within 90 days. Tr. 372:22—373:7. Prague's 90-day tabulation used the same methodology as the 60-day tabulation, but is based on the more conservative assumption, or inference, that accounts outstanding without payment only for 90 or more days can be reasonably assumed to be disputed. Using this more conservative analysis, Prague determined that, as of February 28, 1993, accounts with a face value of $1,318,293 had been outstanding for at least 90 days without any payment from a Third Party Obligor. Prague concludes that these accounts are disputed, and therefore Rejected.

Plaintiff contends that Prague's analysis is reliable, and is corroborated by the testimony of Lisa Schreckenbach at trial, by Hunt Health's financial records, and by Texas law. Schreckenbach, an employee of Hunt Health, testified as follows: "As a rule, we received some type of initial response within the first 60 days. Usually the financial payment or any finalization, final denial, anything of that sort was not received until 90 days or longer." Tr. at 758:7–11. Hunt Health's financial statements record initial payments from Towers as liabilities, rather than assets. Tr. 304:12—305:13. Hunt Health also recorded on its balance sheet an entry labeled "allowance for doubtful accounts." Tr. 319:12–17. The amount that Hunt Health classified as "doubtful accounts" increased during its relationship with Towers, such that by February 1993 Hunt Health classified $2,409,390 in its general ledger as allowance for doubtful accounts. Tr. 322:1—325:14. Finally, plaintiff claims that the timelines for responding to a claim set forth in Texas' Insurance Code corroborate his position.

The Court finds that plaintiff has not shown by a preponderance of the evidence that accounts that Hunt Health sold to Towers as of February 26, 1993, for which no payment was received within 60 or 90 days are disputed, and therefore Rejected Accounts. Prague's analysis is based on a reasonable assumption, namely, that the longer an account remains unpaid, the more likely it is that the insurance company obligated to pay the account disputes the payment. This assumption is not necessarily justified for all accounts, however. A delay in payment for more than 90 days can be logically attributed to the insolvency of the Third Party Obligor. As Towers bore the risk of loss under the HCP Contract for a Third Party Obligor's insolvency, an account would not be Rejected if insolvency caused the delay in payment or response. Thus a delay in payment or response for any amount of time may be attributable to a dispute by the Third Party Obligor, or by its insolvency.

More importantly, even if the Court accepts Prague's reasonable assumption, doing so does not necessarily lead to the conclusion that accounts for which no payment has been received within 60 or 90 days according to the aged accounts re-

ceivable reports are disputed or denied. The record does not indicate that, more likely than not, insurance companies obligated to make payments for treatment provided by Hunt Health would have done so within 60 or even 90 days. According to Schreckenbach, who personally worked to collect or follow up on Hunt Health's accounts receivable, more often than not 90 days elapsed before insurance companies submitted a payment or final denial for an account. Schreckenbach did not state that the initial response, made within 60 days, included a payment or denial. The initial response, rather, could perhaps be an acknowledgment of receipt, a procedure contemplated by Texas Insurance Code. Tex. Ins.Code Art. 21.55, § 3(d). Defendants also elicited testimony that certain accounts that Prague considered Rejected by virtue of a delay in payment were later paid by an insurance company. Tr. 462:12—464:18. Insurance companies perhaps simply took longer than 90 days to make a payment, or perhaps Hunt Health "cured" disputed accounts and later received payment. Such a delay in payment would not necessarily violate Texas Insurance Code, under which an insurance company conceivably could delay more than 120 days before making payment without incurring any penalty. As neither party undertook to investigate each account receivable Hunt Health sold to Towers, the record does not support a finding that more than a million dollars worth of Hunt Health's accounts were disputed simply because insurance companies apparently waited 60 or even 90 days before submitting payment.

The Court therefore finds that the Reimbursable accounts receivable for which no payment or response was given within 60 or 90 days by the Third Party Obligor did not give rise to indebtedness.

iii. *Paid Accounts*

Plaintiff also contends that after Hunt Health terminated the contract with Towers it kept payments it received throughout 1993 on accounts it had sold to Towers, and that these payments also give rise to an indebtedness. Plaintiff refers to Prague's analysis to support his contention. Prague isolated those payments Hunt Health received throughout 1993 on accounts it had sold to Towers as of February 26, 1993. Specifically, Prague categorized the payments made on accounts receivable that Hunt Health sold to Towers by account type. Pl. Exh. 210. For example, by the end of 1993 Hunt Health collected and kept payments totaling $628,892 on accounts coded "C" ("Commercial") that it had sold to Towers before February 26, 1993. Prague performed such a tabulation for each account type, or code. The payments made during 1993 for accounts of all types, which Hunt Health did not turn over to Towers, totaled $970,723.

Plaintiff has shown by a preponderance of the evidence that advances on accounts for which Hunt Health later received payment gave rise to an indebtedness. Such indebtedness arises under paragraphs 5 and 8 of the HCP Contract, which state that an account is rejected if the Third Party Obligor is not financially obligated to pay the account. Once Hunt Health received and retained payment from a Third Party Obligor, the Third Party Obligor no longer remained obligated to pay the account, and Towers' advance on the account became an indebtedness owed by Hunt Health.

As discussed below, no breach by Towers permitted Hunt Health to keep both Towers' advances and insurance companies' payments on accounts after termination. Rather, Hunt Health was obligated to turn over to Towers payments on

accounts that it had sold to Towers. Pl. Exh. 2, ¶ 7. Failure to turn over these payments resulted simply in an indebtedness in the amount of Towers' advance on the account. For example, if Towers advanced $30 to Hunt Health in February 1993 for an account, and Hunt Health received payment of $100 for the whole account from the insurance company in June 1993, then Hunt Health simply thereafter owed Towers' its $30 advance, plus 60 cents each month from February to June for factoring fees on the outstanding $30 initial payment, or advance.

Not all of the payments Hunt Health collected in 1993, however, give rise to an indebtedness. In his calculation of payments totaling $970,723, Prague includes payments on accounts coded "AB," "BA," "CA," "PP," "SC," and "SP." Pl. Exh. 210. Accounts with these codes were non-Reimbursable or Rejected, and thus all advances made by Towers on these accounts are already included in the total indebtedness. Including payments on these accounts as part of indebtedness arising out of payment, therefore, would essentially double-count Towers' advances made on these accounts. In other words, Hunt Health cannot be indebted to Towers for accounts with these codes in an amount greater than that advanced by Towers on these accounts. The Court therefore excludes payments on these accounts from Prague's calculation.

The Court therefore finds that accounts for which Hunt Health received and kept payments throughout 1993 became Rejected Accounts, and the advances on these accounts became an indebtedness. The value for these accounts totals $857,605.

c. *Advance Rate*

■ As set forth above, of the $3,556,048 worth of accounts Hunt Health sold to Towers by February 26, 1993, accounts with a value of $421,329 were non-

Reimbursable, accounts with a value of $624,405 were Rejected because they were disputed, and accounts with a value of $857,605 were Rejected because they were paid. These accounts totaled $1,903,339, and advances made by Towers on these accounts constitute an indebtedness owed by Hunt Health to Towers.

Plaintiff suggests that the Court apply a 30% advance rate to the total face value of non-Reimbursable Accounts and Rejected Accounts combined to determine Hunt Health's indebtedness to plaintiff. Plaintiff suggests that the Court apply a 30% advance rate because this rate reflects the contractual arrangement between the parties. Towers was to advance 50% of the Reimbursable value of each account it purchased from Hunt Health, and Towers applied a dilution factor such that ultimately it advanced 30% of the face value of an account to Hunt Health upon purchase. Defendants contend that plaintiff cannot support the application of a 30% advance rate. Defendants offer, however, no other suggestion.

The record is clear that after the parties converted to "bulk," Towers did not advance funds to Hunt Health on an account-by-account basis. Towers did not, for example, purchase a $100 account and advance $30 to Hunt Health. Rather, Hunt Health requested transfers of funds and Towers made them, while Towers retrieved all the payments made to Hunt Health for accounts receivable. Hunt Health's requests for funds and Towers' retrieval of checks were made in bulk, without regard to the value of any particular accounts. Neither Hunt Health nor Towers recorded, or was able to record, the amount of advances on each particular account transacted between the parties. The record therefore lacks any evidence that Towers in fact advanced funds in the amount of 30% of the non-Reimbursable

and Rejected Accounts after the conversion to bulk.

The record, however, is not silent about the cumulative amount of advances Towers made to Hunt Health after the conversion to bulk. As of February 26, 1993, Hunt Health had sold accounts receivable to Towers with a face value of $3,556,048, and Towers had made $910,870 in advances to Hunt Health. Thus, on the date of termination, Towers' advances to Hunt Health represented 25.6% of the face value of the accounts Hunt Health had sold. The record is uncontroverted, in fact, that Towers' cumulative advances under the bulk method as of February 26, 1993, represented 25.6% of the cumulative value of the accounts receivable.

The Court finds that the 25.6% advance rate is supported by a preponderance of the evidence, and accordingly applies it to determine Hunt Health's indebtedness. Towers' advances effectively totaled 25.6% of each account sold to it by Hunt Health.

### 2. Factoring Fees

The second source of Hunt Health's indebtedness to Towers are the factoring fees. Pursuant to the amended agreements between the parties, Hunt Health agreed to pay to Towers a factoring fee of 2% per month "of the Average Outstanding Daily Balance from Towers to [Hunt Health]." Pl. Exh. 257. According to the September Factoring Fees Amendment, "[t]he term 'Average Outstanding Daily Balance' shall mean the amounts paid to [Hunt Health] by Towers with respect to Accounts as to which payment has not been received for each respective month." Pl. Exh. 257. Under the plain terms of this amendment, the term "Average Outstanding Daily Balance" does not distinguish between advances made on Reimbursable and non-Reimbursable Accounts, or on non-disputed and Rejected Accounts. Rather, pursuant to the agreement between the parties, Hunt Health owes a factoring fee of 2% per month of the total amount of outstanding advances made by Towers.

As of February 26, 1993, Towers' outstanding advances to Hunt Health totaled $910,870. It is undisputed that these advances have remained outstanding since February 1993, and that Hunt Health never has paid any factoring fees on these outstanding advances. Hunt Health therefore is indebted to Towers in the amount of 2% per month of $910,870. This 2% fee totals $18,217 per month.

### B. Does Hunt Health's Early Termination Entitle Plaintiff to Early Termination Damages?

Pursuant to the September Early Termination Amendment agreed upon by Towers and Hunt Health, Hunt Health could elect to terminate the HCP Contract early. The Early Termination Amendment, properly read in conjunction with paragraph 10 of the HCP Contract, appears as follows:

> [Hunt Health's] obligations under paragraph 2 will terminate upon the earlier of (a) 90 days following notice by [Hunt Health] to [Towers] or by [Towers] to [Hunt Health] of an intent to terminate or (b) December 31, 1994. [Hunt Health] may elect to terminate this Agreement prior to the expiration of its term by providing to [Towers] written notice of [Hunt Health's] election to do so and by paying to [Towers], as liquidated damages only and not as a penalty, the sum of Ten Thousand ($10,000) Dollars for each month, or part thereof, remaining on this Agreement from the date of such notice.

Pl. Exhs. 2, 7.

Plaintiff contends that defendants owe $230,000 in liquidated damages, which is the sum of $10,000 per month for the 23

partial or whole months that elapsed between Hunt Health's termination letter on February 26, 1993, and the natural expiration of the contract on December 31, 1994. Defendants respond that the Early Termination Amendment is not enforceable, and that even if it is enforceable, it only requires Hunt Health to pay $30,000 in liquidated damages, which is $10,000 per month for 90 days following the February 26, 1993, notice of termination.

 As to defendants' first argument, the Court holds that the liquidated damages provision is enforceable. "A liquidated damages clause generally will be upheld by a court, unless the liquidated amount is a penalty because it is plainly or grossly disproportionate to the probable loss anticipated when the contract was executed." *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 740 (2d Cir. 1989) (citing *Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 361 N.E.2d 1015, 1018, 393 N.Y.S.2d 365, 369 (1977)). "Liquidated damages are not penalties if they bear a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." *Id.*; *see McKinley Associates, LLC v. McKesson HBOC, Inc.*, 110 F.Supp.2d 169, 178 (W.D.N.Y.2000) ("[C]ourts uphold contractual provisions fixing damages for breach when the terms constitute a reasonable mechanism for estimating the compensation which should be paid to satisfy any loss flowing from the breach." (internal quotations omitted)). The party challenging the liquidated damages provision bears the burden of proving that the provision constitutes a penalty. *Rattigan v. Commodore Intern. Ltd.*, 739 F.Supp. 167, 170 (S.D.N.Y.1990) (citing *P.J. Carlin Constr. Co. v. City of New York*, 59 A.D.2d 847, 399 N.Y.S.2d 13, 14 (1st Dep't 1977)).

 Defendants have not shown that the liquidated damages provision constitutes a penalty. Defendants offered no evidence to show that the liquidated amount is plainly or grossly disproportionate to the loss Towers could anticipate upon Hunt Health's early termination. The only evidence at trial as to the probable loss anticipated in September 1992 supports the contrary conclusion. The agreements between the parties provided that Hunt Health could accept up to $1,000,000 in advances from Towers. The factoring fees Hunt Health would owe Towers were measured as a percentage of the total outstanding advances. Thus the parties could reasonably anticipate in September 1992 that Hunt Health would owe $20,000 each month to Towers in factoring fees. Liquidated damages of $10,000 per month bear a reasonable proportion to this amount, which Towers could anticipate losing if Hunt Health's early termination stripped it of the opportunity to purchase Hunt Health's accounts. The liquidated damages therefore are not a penalty, and the Early Termination Amendment is enforceable.

As to defendants' second argument, because the plain meaning of the Early Termination Amendment supports plaintiff's position that liquidated damages total $230,000, defendants' argument is to no avail. The Early Termination Amendment provides that Hunt Health may terminate the contract "prior to the expiration of its term" and pay $10,000 for each month "remaining on th[e] Agreement." The expiration of the term of the contract was December 31, 1994. The termination of the contract, by contrast, could occur at any time, depending on whether Hunt Health or Towers gave notice of early termination. Hunt Health terminated the contract prior to the expiration of its term, and thus owes liquidated damages to Towers for each month, or part thereof, remaining on the Agreement. As of February 26, 1993, 23 partial or whole months

remained on the HCP Contract. Hunt Health's early termination of the contract therefore incurred liquidated damages in the amount of $230,000.

### C. *Did Hunt Health Materially Breach?*

Plaintiff contends that Hunt Health committed five material breaches of the agreements between the parties: (1) Hunt Health's sale of non-Reimbursable Accounts and its failure to record which accounts it sold was a material breach; (2) Hunt Health's distributions to Hunt Health's owners were a material breach; (3) Hunt Health's use of proceeds of accounts receivable purchased by Towers was a material breach; (4) Hunt Health's termination without paying liquidated damages was a material breach; (5) Hunt Health's sale of its assets to Esperanza was a material breach. Defendants oppose plaintiff's contentions, arguing that none of its actions constituted material breaches of the contract.

▆▆▆▆ New York law applies in this case. Under New York law, a material breach is a breach that "go[es] to the root of the agreement between the parties," and "is so substantial that it defeats the object of the parties in making the contract." *Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir.1997). In determining whether a breach is material, the Court remains mindful of the special purpose of the contract, *id.,* and considers the following circumstances: "the extent to which the injured party will be deprived of the benefit which [it] reasonably expected"; "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived"; "the extent to which the party failing to perform or offer to perform will suffer forfeiture"; "the likelihood that the party failing to perform or to offer to perform

will cure his failure, taking account of all the circumstances including any reasonable assurances"; and "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." Rest. (Second) of Contracts, § 241(a). When one party commits a material breach, the other party is relieved, or excused, from its further performance obligations. *Felix Frank,* 111 F.3d at 289.

Here, the root of the factoring agreement was the mutual obligation it imposed to exchange initial payments, or advances, provided by Towers, for factoring fees provided by Hunt Health and the ultimate payback of the advance by the Third Party Obligor. The object of the parties in making the HCP Contract and its addenda was to transact accounts receivable so that Hunt Health could receive payments in advance of those submitted by Third Party Obligors, and Towers could in exchange receive factoring fees.

The Court addresses each of Hunt Health's alleged material breaches in turn.

#### 1. *Hunt Health's Sale of Non–Reimbursable Accounts and Record Keeping*

As the Court discusses above, Hunt Health breached the HCP Contract by selling to Towers non-Reimbursable Accounts with a total value of $421,329. Plaintiff contends that the sale of non-Reimbursable constituted a material breach. Plaintiff also contends that Hunt Health's failure to identify in its records the accounts receivable that it had sold to Towers was a material breach. Defendants respond that the evidence presented at trial establishes that Hunt Health was fully able to perform throughout the course of the parties' relationship.

▆▆▆ The Court holds that Hunt Health's sale of non-Reimbursable Ac-

counts and its failure to record which accounts it sold to Towers did not constitute a material breach, for several reasons. First, plaintiff presumes that Hunt Health sold non-Reimbursable Accounts with a value of $1,309,248. This Court finds above, however, that the amount of non-Reimbursable accounts sold to Towers totals $421,329. The value of the non-Reimbursable Accounts sold by Hunt Health represented only roughly 12% of the value of all accounts sold, a much less significant portion than that asserted by plaintiff. Second, the parties' performance, in fact, remained unaffected by Hunt Health's sale of non-Reimbursable Accounts. Nidever and Gardner retrieved checks on behalf of Towers without consideration for whether they constituted payments on Reimbursable or non-Reimbursable Accounts, and continued to do so through February 1993. Third, Towers itself is partially responsible for Hunt Health's sale of non-Reimbursable Accounts, as the "sale" in practice consisted of Towers' representatives picking up checks mailed to La Hacienda. While Towers' part in the actual sale of the non-Reimbursable Accounts does not justify Hunt Health's failure to return advances on such accounts, which is the indebtedness discussed above, Towers' part in the sale does provide evidence that such sale hardly defeated the object of the agreement. And fourth, the HCP Contract contemplates that the sale of non-Reimbursable Accounts does not defeat the object of the contract, as it provides for Towers' recourse in the event of sale of a non-Reimbursable Account. As noted above, sale of a non-Reimbursable Account gives rise to an indebtedness because such accounts fail to meet the representations and warranties of paragraph 8(i) of the HCP Contract.

Hunt Health's failure to record which accounts it had sold to Towers did not constitute a material breach. Plaintiff has shown by a preponderance of the evidence that Hunt Health sold all of its accounts to Towers as of February 26, 1993, thus Hunt Health's aged accounts receivable reports effectively "record" its sale of accounts. Moreover, each side failed in its accounting and paperwork obligations, and these failures did not hinder the parties' performance. While the agreements obligated Hunt Health to record the accounts it sold, they also obligated Towers to record and submit to Hunt Health a list of the accounts it purchased. Neither party maintained this practice after the conversion to bulk, yet the contractual relationship continued to work between the parties, as they continued to exchange advances and accounts receivable.

The root, or object, of the factoring agreement between Towers and Hunt Health was the exchange of advance funds provided by Towers for factoring fees provided by Hunt Health and the eventual payback of the advance by the Third Party Obligor. Hunt Health's sale of non-Reimbursable Accounts represented a breach of the agreements, but the breach hardly went to the root of the agreement. Rather, the object of the agreement, and the parties' continuing performance toward that object, was not interfered with by these breaches of Hunt Health.

### 2. *Hunt Health's Distributions to Investors*

█ The Security Agreement requires Hunt Health to notify Towers of any material changes in the financial condition of Hunt Health or its guarantors or anything that materially impairs the value of the collateral subject to Towers' lien, which is all of Hunt Health's accounts receivable. Pl. Exh. 8, ¶ 5. From September 1991 through February 1993, Hunt Health distributed cash to investors while at the same time reporting losses in operating cash. Plaintiff contends that this caused a

cash shortfall, and this cash shortfall ultimately caused Hunt Health to seek a new factor, to convert proceeds it received on accounts it had sold to Towers, to terminate the agreements early, and to fail to pay liquidated damages for early termination. Defendants do not argue that Hunt Health did not make these distributions, nor do defendants seem to contend that Hunt Health did not suffer a cash shortfall. Rather, defendants argue that the distributions did not rise to the level of a material breach.

The Court holds that Hunt Health's distributions to partners did not rise to the level of a material breach. The Court has already found that the distributions constituted a breach, and the evidence submitted at trial shows that Hunt Health's investors, in particular Gaines and McDonough, put $600,000 of capital into Hunt Health and took $800,000 out of Hunt Health as distributions, at a time when Hunt Health was reporting a loss of operating cash. These distributions reduced the operating cash of Hunt Health, which in turn caused problems related to its contractual arrangement with Towers. The distributions, however, did not defeat the object of the agreements, which was, again, to exchange advance payments for the right to factoring fees from Hunt Health and to eventual receipt of payment from the insurance company. The parties continued to perform towards this object until termination, and did so independently of and unobstructed by Hunt Health's distributions. Moreover, although the problems seemingly caused by the distributions interfered with Hunt Health's ability to uphold its end of the bargain, these problems did not ultimately deprive Towers from the benefit it reasonably expected. While Hunt Health made the distributions, Towers continued to retrieve checks sent to Hunt Health on accounts receivable, and to earn its factoring fees. Only Hunt Health's termination deprived Towers of the factoring fees on accounts it had purchased.

### 3. *Hunt Health's Retention of Proceeds on Accounts It Had Sold to Towers*

■ Hunt Health terminated the contract on February 26, 1993, by which time it had received from Towers advances in the amount of $910,870 on accounts it had sold to Towers. The HCP Contract provides that Hunt Health must forward to Towers any checks it receives for accounts Hunt Health sold to Towers. Pl. Exh. 2, ¶ 7. After termination, Hunt Health did not forward funds it collected on accounts it had sold to Towers before termination. Plaintiff claims that this failure constitutes a material breach.

Defendants respond that after termination they attempted to "buy back" the accounts they had sold to Towers. Towers rejected their proposal. Defendants state that Towers was no longer agreeing or in a position to advance funds, and that Towers continued to have a lien on Hunt Health's accounts receivable. Defendants contend that these circumstances left Hunt Health in an "impossible position."

> If it continued to forward its collections to Towers while it had no source of operating income and no ability to enter into an alternative financing or factoring arrangement, it faced certain destruction as a going concern and severe disruption of patients' treatment. If it retained the proceeds of its collections in mitigation of its damages sustained or to be sustained by reason of Towers' failures to (a) collect on Hunt Health's accounts, (b) accept Hunt Health's offer to buy back its accounts receivable, and (c) pay the balance of the purchase price due on accounts previously purchased, Hunt Health could continue to treat its patients responsibly and survive as a

going concern. Hunt Health reasonably and appropriately chose the latter course.

Defendants' Proposed Findings of Fact and Conclusions of Law, at 107–08, ¶ 137.

■ The Court finds that Hunt Health's retention of the proceeds it collected on accounts it had sold to Towers constitutes a material breach. "Failure to tender payment is generally deemed a material breach of a contract." *ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir.1991). Here, the root of the agreement between the parties was Towers' obligation to advance funds and Hunt Health's obligation to pay factoring fees until payment arrived from the Third Party Obligor, as this payment covered Towers' initial payment and ceased the accrual of factoring fees on that account. Hunt Health's retention of the proceeds of accounts it sold to Towers went to the root of the agreement, defeating the object of the contractual relationship. By keeping all of the payments made on accounts sold to Towers, Hunt Health deprived Towers of the benefit it reasonably expected, namely, the return of its advances plus factoring fees. Hunt Health thereby materially breached the agreement. The Court takes up the consequence of this material breach below.

In reaching this holding, the Court is mindful of the circumstances facing Hunt Health on February 26, 1993, and in the following months. Defendants' contention, however, that Hunt Health faced an "impossible situation," relies upon a description of affairs that is not supported in the record. First, Hunt Health did not show that it was damaged by Towers such that its retention of payments can fairly be considered "mitigation." The record contains no evidence that Hunt Health was damaged by Towers' failure to collect, other than perhaps the incidental references to the fees charged by KMBS to collect on accounts after the conversion to bulk. Hunt Health's contention that it was unreasonably damaged by Towers' rejection of its buy back proposal is unsupported. *See infra* I.E.2.a. After termination, Towers in fact computed the outstanding balance, which was the amount Towers had advanced Hunt Health plus factoring fees and early termination damages, and stated that termination of Towers' security interests will not be accomplished until receipt and clearance of funds. Defs. Exh. 45. As for Towers' failure to pay the balance of the purchase price due on accounts previously purchased, Towers could not be expected to forward this balance to Hunt Health if Hunt Health was keeping the payments. Moreover, even if Hunt Health's retention of payments can properly be characterized as "mitigation," Hunt Health would only have been justified in keeping 74.4% of the payments it received, because Towers had already advanced funds to Hunt. Health in the amount of 25.6% of those payments. Hunt Health offers no reason why it kept all of the advances and all of the funds. In any event, Hunt Health's selection of the "latter course" lacks the justification asserted by defendants.

Defendants' description of the former course also is not supported in the record. There is no evidence in the record to show that, had Hunt Health continued to forward payments to Towers, Towers would have improperly refused to return funds in the amount of the balance of the accounts receivable. As Towers had the right to offset advances made on Rejected Accounts, and Hunt Health had sold Rejected Accounts, Towers may have properly refused to return funds in the exercise of its right. But defendants' characterization of the impossible situation they faced in February 1993 assumes that Towers would have improperly refused to remit funds owed to Hunt Health, and the record lacks

any evidence to support this assumption. The record is, in fact, necessarily silent on the matter, as Hunt Health made no effort to forward any payments to Towers.

Hunt Health therefore materially breached the contract by retaining payments submitted after termination on accounts it had sold to Towers.

### 4. Hunt Health's Failure to Pay Liquidated Damages Upon Termination

■ Hunt Health's failure to pay liquidated damages upon early termination constituted a material breach of the agreements between the parties. As discussed above, Hunt Health terminated the contract early. Hunt Health did not pay any liquidated damages although the Early Termination Amendment unambiguously provided for such damages. The parties agreed that Hunt Health would pay liquidated damages to Towers in the amount of $10,000 per month in anticipation of the probable loss Towers would suffer if Hunt Health terminated the contract early, as such early termination would deprive Towers of the opportunity to earn factoring fees. Hunt Health's failure to pay liquidated damages, as set forth in the agreements, deprived Towers of the benefit that it reasonably expected. This deprivation constituted a failure to tender payment, which, as noted above, "is generally deemed a material breach of a contract." ARP Films, 952 F.2d at 649. Hunt Health's failure to pay liquidated damages upon electing to terminate the agreements early severed the root of the agreement between the parties, and therefore constituted a material breach of the agreements.

### 5. Hunt Health's Sale of Assets to Esperanza

The Court need not determine whether Hunt Health's sale of assets to Esperanza constitutes a material breach. Before it transferred its assets to Esperanza, Hunt Health materially breached the HCP Contract by failing to pay liquidated damages, and by failing to turn checks over to Towers on accounts that it had sold. The purpose of the agreements had already been thwarted by April 1, 1993, when Hunt Health transferred its assets. Certainly Hunt Health's transfer of assets was problematic, and, had the agreements between the parties remained operable or salvageable at that time, the transfer may have defeated the object of the agreements. The evidence at trial on this issue is necessarily lacking, however, as the object of the agreements between the parties had been defeated prior to the transfer.

In sum, plaintiff has shown by a preponderance of the evidence that Hunt Health materially breached the agreements between the parties by failing to turn over checks to Towers that it received on accounts it had sold, and by failing to pay liquidated damages. The Court takes up below the ramifications of these material breaches, in particular, whether they were excused by any earlier breaches of Towers, and what consequences Hunt Health's material breaches had for the parties' continuing performance obligations. See infra I.E.

### D. Did Towers Breach Its Collection Obligation?

■ Defendants contend that Towers breached its obligation to collect on accounts it purchased from Hunt Health. The Court has already ruled that plaintiff is judicially estopped from arguing that the HCP Contract did not impose a collection obligation on Towers. Wechsler, 1999 WL 397751, at *9–10. The HCP Contract, in other words, imposed a collection obligation on Towers. The evidence at trial shows that Towers breached its collection obligation.

Plaintiff did not offer evidence to show that Towers had collected on accounts from September 1992 through February 1993 and after termination. The evidence at trial instead shows that beginning in September 1992 plaintiff did not perform on its obligation to collect. In October 1992 Hunt Health hired KMBS to perform collection services, and the only evidence offered about collection of accounts after October 1992 relates to KMBS's collection efforts. The deposition testimony to which plaintiff cites, particularly that of Towers' employees Lynn McLaughlin and Richard Barbuto, shows only that Towers continued to function as a business during the initial stages of its bankruptcy during 1993. Plaintiff offered no testimony, however, showing that Towers satisfied its obligation under the HCP Contract to collect on accounts it purchased from Hunt Health. The Court therefore finds that Towers breached its obligation under the HCP Contract to collect on accounts it purchased, both before and after Hunt Health's termination.

The Court finds further, however, that Towers' failure to collect did not constitute a material breach. A material breach, again, is one that "go[es] to the root of the agreement between the parties," and "is so substantial that it defeats the object of the parties in making the contract." *Felix Frank*, 111 F.3d at 289. Defendants contend that Towers' failure to collect constituted a material breach. The evidence on which defendants rely to support this contention is Towers' brochure (Defs.Exh. 87) and the direct testimony of Ms. McDonough (Tr. 800:18—801:22). Defendants argue that "Hunt Health decided to enter into a factoring relationship with Towers because (a) Hunt Health needed more efficient collection of its accounts receivable . . . and (b) the Towers brochure stated that collection was one of the services Towers provided to its clients." Collec-

tion, contend defendants, constituted the object of the agreement.

The Court's review of the evidence reveals the contrary, however, that the object of the contract was the exchange of advance payments for factoring fees and the eventual reimbursement of those advances upon receipt of payment from the Third Party Obligor, and that Towers' failure to collect did not constitute a material breach. Towers' obligation to collect, like Hunt Health's obligation to sell only Reimbursable accounts, did not constitute the root or object of the agreement. First, the parties seamlessly maintained their contractual relationship during the fall of 1992, when KMBS took up collection duties on Hunt Health's behalf. During this time, after the conversion to bulk, Towers continued to make advance payments requested by Hunt Health, and Hunt Health continued to sell accounts to Towers and thereby incur factoring fees payable to Towers.

Second, the evidence at trial shows, in fact, that Towers' failure to collect played no role in the ultimate destruction of the parties' contractual relationship that culminated in Hunt Health's early termination. The minutes of the governing body of Hunt Health do not include any reference to Towers' failure to collect in the months preceding the early termination. Rather, the governing body of Hunt Health decided to terminate early chiefly because advances from Towers neared the $1 million cap. The remark of Hunt Health's controller, Lori Dittmar, that Hunt Health had "maxed out on factoring with Towers Financial," exemplifies the reasoning behind the governing body's decision to terminate, and confirms that the viability of the contractual relationship depended on Hunt Health's receipt of advances from Towers, not on Towers' collection of accounts. Pl. Exh. 147; Tr. 904:15—907:24.

Third, the evidence referenced by defendant, Towers' brochure and the direct testimony of Ms. McDonough, shows only that collection constituted an aspect of the agreement between the parties. The brochure, for example, emphasizes that Towers provides collection services and accounts receivable factoring and financing. Defs. Exh. 87. And Ms. McDonough, when asked about why Hunt Health entered into a factoring relationship with Towers, answered "We had a cash flow problem and this looked like it would smooth things out and it would be an even cash flow. Then we also had—we needed more efficient collection and it obviously says in the brochure that that's one of the things that they do." Tr. 800:18—801:1. The brochure, however, is not included as part of the agreements between the parties, and while the HCP Contract references in detail the terms of Towers' factoring and financing services, it does not reference any of the collection services outlined in Towers' brochure. Defendants' position that collection was the object of the agreement relies less on a realistic assessment based on the agreements between the parties and more on a plausible assessment based on a favorable emphasis on parts of Towers' brochure not included in the agreements.

Defendants' emphasis on Towers' collection obligation essentially stretches the Court's judicial estoppel ruling beyond its limits. The Court ruled on summary judgment that "plaintiff is judicially estopped from now asserting Towers had no collection obligation under the HCP Contract," because plaintiff took the position in another litigation that the same form contract "require[s] Towers to collect the accounts." *Wechsler*, 1999 WL 397751, at *10. This ruling, rather than any contractual term between the parties, supports defendants' position that Towers' failure to collect constituted a breach of the HCP Contract. This ruling does not, however, support de-

fendants' position that Towers' obligation to collect was so central to the factoring agreement that Towers' failure to do so damaged the root of the agreement and irretrievably erased Hunt Health's obligations under the agreement. The Court observed in its judicial estoppel ruling that Towers' breach of its obligation to collect "may not be material so long as Towers fulfills any remaining payment obligations." *Id.* A review of all of the evidence at trial reveals precisely that Towers' failure to collect constituted a breach, but not a material breach because it left undisturbed the exchange of advance payments for factoring fees.

### E. What Effect Did Hunt Health's and Towers' Respective Breaches Have on the Parties' Performance Obligations

The chief purpose of the bench trial in this action has been to untie the knot twisted together by the parties' repeated breaches, material and otherwise, so that, once loosened, the effect of each of these breaches on the contractual relationship becomes plain. Having carefully unraveled this knot, the Court now turns to the final analysis of the elements of, and defenses to, plaintiff's breach of contract claim.

### 1. Plaintiff Satisfies the Elements of Breach of Contract

As noted above, to make out a successful breach of contract claim, plaintiff must show (1) the existence of a contract, (2) plaintiff's performance, (3) breach by the defendant, and (4) damages. *See Harsco Corp.*, 91 F.3d at 348. The parties agree that a contract existed between Towers and Hunt Health, but disagree about whether the preponderance of evidence shows that Towers performed, Hunt Health breached, and damages resulted.

Plaintiff claims that he has met his burden by a preponderance of the evidence on each of these elements, upon evidence submitted at trial and the prior rulings of this Court. Defendants claim that plaintiff did not establish at trial that Towers fulfilled its contractual obligations, plaintiff did not establish that Hunt Health breached the collected agreements, and plaintiff did not establish damages. Defendants also assert defenses to plaintiff's breach of contract claim that defendants contend bar recovery. Defendants contend that plaintiff failed to mitigate damages, Towers elected to affirm the contract or waived its rights, and the HCP Contract was an executory contract that plaintiff rejected.

### a. Plaintiff's Performance

 Defendants contend that plaintiff cannot prevail on a breach of contract claim because Towers breached the agreements by failing to fulfill its collection obligation. Defendants claim that, because Towers breached, plaintiff is unable to satisfy the second element of his breach of contract claim, namely, Towers' performance.

The Court disagrees. The same analysis applies when considering whether Towers performed on the contract and whether Towers' failure to collect constitutes a material breach. *See Hadden v. Consolidated Edison Co. of New York, Inc.*, 34 N.Y.2d 88, 96; 356 N.Y.S.2d 249, 312 N.E.2d 445 (1974) ("[I]t is not every breach of a constructive obligation which will excuse the other party from rendering its performance under the contract.... If the party in default has substantially performed, the other party's performance is not excused."); *F. Garofalo Elec. Co., Inc. v. New York University*, 300 A.D.2d 186, 188–89, 754 N.Y.S.2d 227 (1st Dep't 2002) (holding that "[i]f [plaintiff] substantially performed its contractual obligations, then it would be entitled to the payment due under the contract less the cost of any

correction of defects in its performance," even if it breached the contract); *Anderson Clayton & Co. v. Alanthus Corp.*, 457 N.Y.S.2d 578, 579, 91 A.D.2d 985 (2d Dep't 1983) (finding that plaintiff performed because "the primary purpose of the contract was fulfilled"); *CSC Recovery Corp. v. Daido Steel Co., Ltd.*, No. 94 Civ. 9214, 2000 WL 134578, *6 (S.D.N.Y. Feb. 4, 2000) (" 'Several factors bear on whether a party has substantially performed under a contract, including the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the performance.' " (quoting *Hadden*, 34 N.Y.2d at 96, 356 N.Y.S.2d 249, 312 N.E.2d 445)); *le Cordon Bleu, S.A. v. BPC Pub. Ltd.*, 451 F.Supp. 63, 71 (S.D.N.Y. 1978) ("It is well established that where, as here, the non-performance of one party to a contract is innocent, does not thwart the purpose of the bargain, and is wholly dwarfed by that party's performance, then the breaching party has substantially performed its obligations. In such a case, the non-breaching party is not excused from its responsibilities under the contract."); *see also Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 692, 660 N.E.2d 415, 419, 636 N.Y.S.2d 734, 738 (1995) (noting that the "mitigating standard of materiality or substantiality applicable to the non-occurrence of [an] event," while generally a "flexible concept," does not apply when the parties "have made an event a condition of their agreement"); N.Y. Jur Contracts § 355; Rest. of Contracts Second § 237.

For the same reasons that Towers' failure to collect does not constitute a material breach, *see supra* I.D., it does not relieve Hunt Health of its obligations under

the contract, and it does not show that Towers did not substantially perform its contractual obligations. Rather, the evidence at trial shows that Towers purchased accounts from Hunt Health and forwarded payments to Hunt Health for those accounts in advance of receipt of payment by the Third Party Obligor. Towers performed on this obligation from the inception of the HCP Contract in 1991 until its early termination in February 1993. Towers' failure to collect in the fall of 1992, which had little or no effect on the parties' contractual relationship, did not relieve Hunt Health of its obligations, and does not bar recovery on plaintiff's breach of contract claim.

The Court therefore finds that plaintiff satisfies the second element of his breach of contract claim by showing that Towers performed on the agreements.

b. *Breach by the Defendants*

Defendants breached the agreements between the parties in five ways.

First, Hunt Health sold non-Reimbursable and Rejected Accounts to Towers with a face value of $1,903,339, despite the agreement between Towers and Hunt Health set forth in paragraphs 1, 8(i), and 8(viii) of the HCP Contract to transact only Reimbursable Accounts that are not denied, disputed, or paid. *See supra* I.A.1.a.,b.,c.; *Wechsler*, 1999 WL 397751, at *7.

Second, Hunt Health distributed $787,711 to investors from September 1991 to February 1993, despite the agreement between Towers and Hunt Health set forth in paragraph 5 of the Security Agreement obligating Hunt Health to notify Towers of any event that materially impairs the value of Towers' collateral, and despite the agreement set forth in paragraph 8(ix) of the HCP Contract obligating Hunt Health to do nothing to impair Towers' right in

the accounts it purchased. *See supra* I.C.1.; *Wechsler*, 1999 WL 397751, at *5–6.

Third, Hunt Health retained payments it received during 1993 on accounts it had sold to Towers, despite the agreement between Towers and Hunt Health set forth in paragraph 7 of the HCP Contract that Hunt Health shall immediately deliver such payments to Towers. *See* Pl. Exh. 2, ¶ 7; *supra* I.C.3. This breach, moreover, was material. *See supra* I.C.3.

Fourth, Hunt Health terminated the contract early without paying any liquidated damages, despite the agreement between Towers and Hunt Health set forth in the September Early Termination Amendment obligating Hunt Health to pay liquidated damages in the event of early termination. *See supra* I.B., I.C.4. This breach also was material. *See supra* I.C.4.

Fifth, Hunt Health transferred all of its assets to Esperanza on April 1, 1993, despite the agreement between Towers and Hunt Health set forth in paragraph 52 of the Security Agreement obligating Hunt Health to maintain Towers' security interest until all secured indebtedness has been paid in full. *See* Pl. Exh. 8, ¶ 52; *supra* I.C.5.

None of Hunt Health's breaches were excused, or justified, by Towers' failure to collect. As the Court notes above, Towers substantially performed on its obligations and its failure to collect was not a material breach. *See supra* I.D., I.E.1.a. Hunt Health's failures to, among other things, sell Reimbursable Accounts and forward payments it received had nothing to do with Towers' collection obligation, and do not find justification in Towers' non-material breach. *See Hadden*, 34 N.Y.2d at 96, 356 N.Y.S.2d 249, 312 N.E.2d 445 (1974) ("[I]t is not every breach of a constructive obligation which will excuse the other party from rendering its performance under the contract. . . . If the party in default

has substantially performed, the other party's performance is not excused.").

### c. *Damages*

The final element plaintiff must prove is damages. Plaintiff satisfactorily proves this element.

██ The Rider between Towers and Hunt Health provides, "[u]pon the occurrence of an Event of Default all Obligations shall become immediately due and payable." Pl. Exh. 6, ¶ D. The Rider defines "Obligations" as including "all present and future debts, liabilities, obligations, interest and charges of any kind whatsoever owing by [Hunt Health] to [Towers] in connection with the [HCP Contract], whether with respect to Rejected Accounts or otherwise." Pl. Exh. 6, ¶ E. The Security Agreement provides that "[Towers] may exercise its lien upon and right of setoff against any monies, items, credits, deposits or instruments that [Towers] may have in its possession and which belong to [Hunt Health] or to any other person or entity liable for the payment of any or all of the Secured Indebtedness." Pl. Exh. 8, ¶ 42(e). The Security Agreement defines "Secured Indebtedness" as "all present and future debts and other obligations of [Hunt Health] to [Towers] (including interest, fees, charges, costs, expenses and attorneys fees), whether arising by contract, tort, guaranty, or otherwise; whether or not the advances or events creating such debts or other obligations are presently foreseen; ... Without limiting the foregoing, the "Secured Indebtedness" specifically includes the obligations of [Hunt Health] under this Agreement and any indebtedness arising under the purchase contract."

These "acceleration clauses" confirm that all indebtedness owed from Hunt Health to Towers becomes due upon a breach. Defendants argue that "[u]nder the security agreement relied upon by plaintiff, an event of default requires a notice of such default to Hunt Health." Defendants do not cite any term in the security agreement to support this argument. Defendants add that under the applicable case law "a contemporaneous notice of default to the alleged breach is necessary for the equitable enforcement of acceleration clauses." Defendants' Opposition Memorandum to Plaintiff's Conclusions of Fact and Law, at 48, n. 36 (citing, among other things, *Key Int'l Mfg., Inc. v. Stillman*, 103 A.D.2d 475, 480 N.Y.S.2d 528, 530 (2d Dep't 1984); *Fifty States Mgt. Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 577, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979)). Plaintiff, citing the same case law, argues that notice of default is not a condition for the enforcement of an acceleration clause.

The Court finds no requirement of notice in the security agreement. Rather, paragraph 42, titled *"Remedies Upon Default,"* provides the following: "Upon default, [Towers] may pursue any or all of the following remedies, without any notice to [Hunt Health] except as required below: (a) *Notice of Default.* [Towers] may give written notice of default to [Hunt Health], following which [Hunt Health] shall not dispose of ... any of the Collateral...." Pl. Exh. 8, ¶ 42(a). The Security Agreement, in other words, states the opposite of what defendants have represented it states to the Court.

Moreover, the case law supports the enforcement of the acceleration clauses without notice. As plaintiff notes, "[a]cceleration clauses are quite common and are generally enforced according to their terms." *Key Int'l*, 480 N.Y.S.2d at 530; *see Fifty States Mgt. Corp.*, 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (upholding enforcement of acceleration clause without notice because "[a]bsent some element of fraud, exploitive overreaching or

unconscionable conduct to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties"). Here, the Security Agreement and Rider do not require Towers to have given notice to Hunt Health of a default for the acceleration clauses to apply. The Court holds that the clauses are enforceable, and finds that Hunt Health's indebtedness to Towers became due upon Hunt Health's breaches of the agreements.

Hunt Health's breaches of the agreements, therefore, make all of Hunt Health's indebtedness to Towers immediately due. The following indebtedness constitutes damages now owed to plaintiff.

### i. *Advances on Non–Reimbursable and Rejected Accounts*

Plaintiff is damaged in the amount of advances Towers made to Hunt Health for non-Reimbursable or Rejected Accounts. Hunt Health's breach of the agreement to transact only Reimbursable Accounts caused these damages directly, and triggered the acceleration clause which likewise makes indebtedness arising from these advances immediately due. The total face value of non-Reimbursable and Rejected Accounts Hunt Health sold to Towers is $1,903,339. Applying the 25.6% advance rate, the Court finds that Towers advanced $487,254 on these non-Reimbursable and Rejected Accounts, and is damaged in that amount.

### ii. *Factoring Fees*

Plaintiff is damaged in the amount of factoring fees owed for the $910,870 in advances made to Hunt Health as of February 1993. Hunt Health's multiple breaches of the agreements triggered the acceleration clause, causing Hunt Health's indebtedness for factoring fees to become immediately due upon their accrual. The factoring fees total $18,217 per month, which is 2% of all of the outstanding advances made from Towers to Hunt Health as of February 26, 1993.

Plaintiff's position is that the factoring fees continue to accrue indefinitely, at least until the resolution of this litigation. Plaintiff's position, however, lacks support under New York's law on remedies.

A "general principle" of contracts is that recovery for breach of contract should put the injured party "in as good a position as he would have occupied had the contract been kept." *Menzel v. List*, 24 N.Y.2d 91, 298 N.Y.S.2d 979, 983, 246 N.E.2d 742, 745, 298 N.Y.S.2d 979, 983 (1969) (citing 11 Williston, Contracts (3d ed.), at 484); *see Siegel v. Laric Entertainment Corp.*, 307 A.D.2d 861, 763 N.Y.S.2d 607, 608–09 (1st Dep't 2003); *Rogen v. Scheer*, No. 86 Civ.2058, 1991 WL 33294, *7 (S.D.N.Y. Feb. 22, 1991) ("In an action for breach of contract the injured party is entitled to the benefit of his bargain as written and is entitled to damages for the loss caused by failure to perform the stipulated bargain and the recovery may include the profits which he would have derived from performance of the contract." (internal quotations omitted)); *Carmania Corp., N.V. v. Hambrecht Terrell Intern.*, 705 F.Supp. 936, 938 (S.D.N.Y.1989) ("The law of contracts is meant to facilitate voluntary economic exchange. Plaintiffs who sue successfully for breach of contract are entitled to damages providing them with the benefit of the bargains they and the defendants chose to strike—i.e., to be placed in the positions they would have enjoyed had the parties' expectations panned out."); Restatement (Second) of Contracts § 347 cmt. a ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in

had the contract been performed."). Damages for breach of contract "can take any of three forms. Any of expectation, reliance or restitution damages may be appropriate bearing in mind that plaintiff must prove any claimed damages were caused by defendant's breach to a reasonable degree of certainty." *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, No. 02 Civ. 9149, 2004 WL 435058, *8 (S.D.N.Y. Mar. 9, 2004) (citing Restatement (Second) of Contracts § 344) (internal quotations omitted). As expectation damages offer the broadest remedy among these forms, "[d]amages for breach of contract are limited to expectation damages— the amount necessary to put plaintiff in as good a position as if defendant had fulfilled the contract." *Saxton Communication Group, Ltd. v. Valassis Inserts, Inc.*, No. 93 Civ. 0388, 1995 WL 679256, *2 (S.D.N.Y. Nov. 15, 1995) (citing *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 728 (2d Cir.1992)).

Here, Towers expected to earn factoring fees on the advances it made to Hunt Health for the sale of accounts receivable, and to do so for as long as the advances were outstanding. Pursuant to paragraph 3 of the HCP Contract, the longest possible amount of time that an advance from Towers to Hunt Health could be outstanding is 365 days from the date of purchase. Pl. Exh. 2, ¶ 3 ("The balance of the Purchase Price will be paid upon the earliest of (i) receipt by [Towers] of good funds in payment of the Account, (ii) thirty (30) days after [Towers] receive[s] notice that the Third Party Obligor will not pay the amount owed for reasons that would not constitute a breach of the representations and warranties set forth in paragraph 8 below or (iii) three hundred and sixty-five (365) days after the date [Towers] purchase[s] the Account."). Once 365 days elapse from the transaction of the account Towers must pay the balance of the account, even if it has not received payment on the account from the Third Party Obligor. Under no understanding of the parties' contractual relationship could Towers expect to earn factoring fees on advances for more than 365 days. In other words, under the plain terms of the HCP Contract, no advance from Towers to Hunt Health could possibly remain outstanding for more than 365 days.

As noted above, *see supra* I.A.2., Towers' outstanding advances to Hunt Health totaled $910,870 on February 26, 1993, when Hunt Health terminated the contract. The factoring fees rate is 2% of $910,870 per month, which is $18,217. Pursuant to the HCP Contract, Towers could expect that, at most, these advances would remain outstanding for 365 days, until February 26, 1994. This span includes thirteen months, including February 1992 and February 1993, during which Towers' advances on accounts receivable remained outstanding. To put plaintiff in as good a position as he would have been had the contract been kept, defendants must pay to plaintiff damages in the amount of $236,821, which is the amount of factoring fees owed each month on Towers' outstanding advances multiplied by thirteen months.

iii. *Early Termination Damages*

The Court finds above that Hunt Health's early termination triggered the early termination damages clause of the agreements between it and Towers, and that liquidated damages in the amount of $230,000 arise under the clause for early termination. This amount represented a reasonable anticipation in September 1992 of the loss Towers would suffer if Hunt Health prematurely ended Towers' opportunity to purchase Reimbursable Accounts and earn factoring fees on those accounts.

■ Plaintiff, however, may not recover early termination damages in addition

to damages for breach of contract. "Under no circumstances ... will liquidated damages be allowed where the contractual language and attendant circumstances show that the contract provides for the full recovery of actual damages, because liquidated damages and actual damages are mutually exclusive remedies under New York law." *U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.*, 369 F.3d 34, 71 (2d Cir.2004). Ordinarily plaintiffs are awarded either actual damages or liquidated damages, but not both when the predicate for the awards is the same. *See, e.g., Federal Realty Ltd. Partnership v. Choices Women's Medical Center, Inc.*, 735 N.Y.S.2d 159, 161, 289 A.D.2d 439, 735 N.Y.S.2d 159 (2d Dep't 2001) (finding that the parties are bound to the liquidated damages clause that anticipates the same breach for which actual damages are sought); *Town of North Hempstead v. Sea Crest Const. Corp.*, 501 N.Y.S.2d 156, 158, 119 A.D.2d 744, 501 N.Y.S.2d 156 (2d Dep't 1986) (permitting recovery of actual damages for abandonment of contract when liquidated damages clause merely anticipated damages resulting from delay).

Here, the loss anticipated by the early termination clause differs in kind from the loss sustained because of Hunt Health's repeated breaches. The early termination clause anticipates that Hunt Health will continue to sell Reimbursable Accounts to Towers and to pay factoring fees to Towers until December 31, 1994. Hunt Health's early termination would deprive Towers of the opportunity, set forth in paragraph 2 of the HCP Contract, to purchase Reimbursable Accounts, make advances on those accounts, and receive factoring fees until the payment of the accounts arrives. Thus the early termination clause estimates Towers' loss in the event that Hunt Health deprives Towers of the opportunity to purchase accounts and earn factoring fees.

Hunt Health, however, did not merely terminate the contract early and deprive Towers of an opportunity to purchase future accounts, but it withheld entirely the payment of factoring fees owed for advances already made prior to early termination. Whereas the early termination clause anticipated the payment of factoring fees, Hunt Health in fact did not make such payments. The September Early Termination Amendment, while reasonable, anticipates a loss to Towers different in kind than that caused by Hunt Health's breaches. *Cf. J.E. Hathaway & Co. v. United States*, 249 U.S. 460, 464, 39 S.Ct. 346, 63 L.Ed. 707 (1919) (Brandeis, J.) ("There is no reason why parties competent to contract may not agree that certain elements of damage difficult to estimate shall be covered by a provision for liquidated damages and that other elements shall be ascertained in the usual manner. Provisions of a contract clearly expressed do not cease to be binding upon the parties, because they relate to the measure of damages.").

The damages anticipated by the September Early Termination Amendment, however, are essentially subsumed in the actual damages suffered by Towers, such that awarding liquidated damages for early termination would grant plaintiff a windfall in excess of the harm sustained. Because Hunt Health failed to pay factoring fees on advances from Towers in the amount of $910,870, those factoring fees continued to accrue each month, even after Hunt Health terminated the contract. Towers therefore continued to earn factoring fees on advances made prior to February 26, 1993, although this "earning" takes the form of actual damages because Hunt Health never made any payments. The lost opportunity to purchase more accounts to earn more factoring fees has not damaged plaintiff in the manner anticipated by the early termination clause. Although

the early termination clause is reasonable, it anticipates a loss incidentally subsumed within the actual damages arising out of Hunt Health's unanticipated conduct, and the law does not countenance the award of liquidated damages compensating such a loss to plaintiff. The Court therefore declines to award early termination damages to plaintiff.

### 2. *None of Defendants' Defenses Apply To Bar Plaintiff's Recovery for Breach of Contract*

Defendants assert three defenses: (1) Towers failed to mitigate damages; (2) Towers elected to affirm the contract; and (3) Towers rejected the agreements when its bankruptcy was confirmed.

#### a. *Failure To Mitigate*

Defendants argue that plaintiff is prevented from recovering any damages because Towers could have mitigated its damages by (1) accepting Hunt Health's offer to buy back its accounts receivable; (2) collecting Hunt Health's accounts receivable; or (3) continuing to pick up checks from Hunt Health.

 Under New York law, an injured party cannot recover damages for a loss that it could have avoided by reasonable efforts. *Wilmot v. State*, 344 N.Y.S.2d 350, 352–53, 297 N.E.2d 90, 32 N.Y.2d 164 (1973). The non-injured party bears "the burden of introducing evidence to prove that plaintiff[ ] could have lessened [its] damages." *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985). Specifically, defendant must show not that plaintiff failed to accept a reasonable offer that would mitigate its losses, but that plaintiff "*unreasonably* failed to mitigate" its damages. *Coastal Power Int'l v. Transcontinental Capital Corp.*, 10 F.Supp.2d 345, 370 (S.D.N.Y.1998). In other words, "if the plaintiff takes such action within the range of reason, the de-

fendant is liable for further damages resulting therefrom." *Ellerman Lines Ltd. v. The Steamship President Harding*, 288 F.2d 288, 290 (2d Cir.1961) (Friendly, J.).

 None of the grounds set forth by defendants demonstrate that plaintiff failed to mitigate damages. The first and most compelling ground offered by defendants is that Towers' rejection of Hunt Health's offer to buy back accounts constitutes a failure to mitigate damages. The evidence shows that Hunt Health's lawyer and C.F.O. made an earnest attempt to pay back the entire amount of outstanding advances made by Towers to Hunt Health, in exchange for Towers' release of its lien on Hunt Health's accounts receivable. Although Hunt Health's initial offer of $877,266 fell short of the amount of advances outstanding by $33,000 (plus three days of factoring fees), Hunt Health sought to pay the entire amount of advances, and clearly would have done so had the parties not disagreed about the amount of early termination fees owed. Pl. Exhs. 168, 172.

In exchange for its buy back payment, however, Hunt Health sought the release of Towers' lien on its accounts receivable. The Rider and Security Agreement between the parties granted Towers a security interest in all of Hunt Health's accounts receivable to secure any and all obligations owing from Hunt Health to Towers that arose out the agreements between the parties. Pl. Exh. 6, 8. Had the buy back offered by Hunt Health accounted for all of its obligations under the agreements, including the early termination fees, Hunt Health likely need not have sought any release of Towers' lien, as no debt would remain for Towers' to secure. A complete buy back by Hunt Health and paying off of indebtedness, in other words, likely would have caused the release of Towers' lien

with or without Towers' express agreement.

In any event, Hunt Health conditioned its offer to buy back accounts on Towers' releasing its lien, even though Hunt Health remained obligated to pay Towers' early termination damages. As Hunt Health did not include early termination damages in its buy back offer, it essentially sought to have Towers' release its security interest without receiving liquidated damages to which it was entitled. Yet Towers' security interest protected it against any obligations owed to it by Hunt Health arising from the agreements, including unpaid early termination damages. Hunt Health, therefore, sought the release of a material contractual right in exchange for a payment of less value than that owed. New York law does not permit a party in such circumstances to prevail on a defense of failure to mitigate damages. Towers' rejection of Hunt Health's buy back offer, which did not include early termination damages, was reasonable, and does not constitute a failure to mitigate damages.

The second and third grounds offered by defendants for Towers' failure to mitigate damages are less compelling. Defendants suggest that Towers could have collected Hunt Health's accounts. This ground fails for several reasons. While the HCP Contract obligated Towers to collect on the accounts, Hunt Health hired KMBS to collect. Defendants offered no evidence to show that any efforts by Towers to collect, in addition to efforts undertaken by Hunt Health and KMBS, would have mitigated damages. Moreover, defendants fail to specify how even successful collection efforts by Towers would have mitigated damages. Plaintiff was damaged by the sale of non-Reimbursable and Rejected Accounts and by the failure to pay factoring fees, neither of which would have been mitigated by Towers' collections.

Defendants suggest last that Towers could have continued picking up checks. The evidence at trial shows, however, that Hunt Health essentially prevented Nidever from picking up checks after February 26, 1993. More importantly, the Court notices that a broader view of defendants' suggestion is jarring. Defendants argue essentially that Towers should have picked up checks at Hunt Health to mitigate plaintiff's damages, and that Towers' failure to do so constitutes a failure to mitigate damages that bars recovery in this action. Yet Hunt Health, upon receiving the same checks that it suggests Towers failed to pick up, made no effort to send those checks to Towers, or take any affirmative steps other than to deposit the checks in Hunt Health's bank account. Having failed to forward checks Towers, Hunt Health hardly can argue that Towers' failure to receive those checks bars recovery.

In sum, the Court finds that Towers did not fail to mitigate damages, and damages owing to plaintiff are therefore not lessened by any such failure.

b. *Election*

Defendants argue that the doctrine of election bars plaintiff's recovery. Defendants contend that Towers knew of Hunt Health's distributions to its investors, and of its sale of non-Reimbursable Accounts. Aware of these breaches, Towers chose to continue the contractual relationship, according to defendants.

The doctrine of election arises from the principle that a party "cannot 'at the same time treat a contract as broken and subsisting. One course of action excludes the other.'" *Inter–Power of New York Inc. v. Niagara Mohawk Power Corp.* 686 N.Y.S.2d 911, 913, 259 A.D.2d 932 (3d Dep't 1999) (quoting *Strasbourger v. Leerburger,* 233 N.Y. 55, 59, 134 N.E.

834 (1922)). Instead, "[w]hen a party materially breaches a contract, the non-breaching party must choose between two remedies—[it] can elect to terminate the contract and recover liquidated damages or [it] can continue the contract and recover damages solely for the breach.... Once a party elects to continue the contract, [it] can never thereafter elect to terminate the contract based on that breach, although [it] retains the option of terminating the contract based on other, subsequent breaches." *ESPN Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 383, 388 (S.D.N.Y.1999) (citations omitted); *see V.S. Int'l, S.A. v. Boyden World Corp.,* 862 F.Supp. 1188, 1196 (S.D.N.Y.1994) (When one party to a contract materially breaches during the course of a continuing performance, the non-breaching party " 'has a choice presented to him of continuing the contract or of refusing to go on.' " (quoting *Apex Pool Equip. Corp. v. Lee,* 419 F.2d 556, 562 (2d Cir.1969) (quoting *Emigrant Industr. Savings Bank v. Willow Builders, Inc.,* 290 N.Y. 133, 145, 48 N.E.2d 293 (1943)))).

Here, whether Towers was aware of Hunt Health's distributions to partners or of Hunt Health's attempt to sell non-Reimbursable Accounts is irrelevant, because Towers did not reap the benefits of the contract after these breaches and later seek to terminate the contract because of these same breaches. Towers, in fact, never sought to terminate the contract and bring an action for rescission or total breach upon Hunt Health's distributions to its investors or Hunt Health's sale of non-Reimbursable Accounts. Towers in fact never rescinded the contract, and only brought the current suit for breach of contract after Hunt Health terminated the contract early and retained payments on accounts. The doctrine of election does not apply, because at no point prior to Hunt Health's early termination did Tow-

ers ever treat the agreements between the parties as "broken and subsisting."

■■■ Because defendants' election argument borrows from the concept of waiver, the Court notes that the doctrine of waiver likewise does not bar plaintiff's recovery. The HCP Contract provides that "Failure by [Towers] to exercise any right, privilege or option under this Agreement or delay by us in exercising the same will not operate as a waiver." Pl. Exh. 2, ¶ 10. The parties reiterated this non-waiver provision by agreeing in September 1992 that "[Towers'] indulgence in the existence of a default hereunder or any other departure from the terms of this Agreement shall not prejudice [Towers'] rights to declare a default or otherwise demand strict compliance with this Agreement." Pl. Exh. 8. Similar agreements have been upheld under New York law, *see, e.g., DeCapua v. Dine–A–Mate, Inc.,* 744 N.Y.S.2d 417, 419, 292 A.D.2d 489 (2d Dep't 2001), and the Court finds here that the no-waiver provisions apply. Towers did not waive its right to recover for Hunt Health's breaches.

### c. *Executory Contract*

Defendants claim that the agreements between the parties constitute an executory contract that Towers rejected once it entered bankruptcy.

■■■ Section 365 of the Bankruptcy Code addresses treatment of a debtor's "executory" contracts. *See* 11 U.S.C. § 365(a). "Executory" contracts are those "on which performance remains due to some extent on both sides." *Eastern Air Lines, Inc. v. Insurance Co. of Pennsylvania (In re Ionosphere Clubs, Inc.),* 85 F.3d 992, 998–99 (2d Cir.1996). The Second Circuit has not settled on a more specific articulation of the definition of executory contracts. *See In re Bradlees Stores, Inc.,* No. 00 Civ. 16033, 2001 WL 1112308, at

*6–8 (S.D.N.Y. Sept. 20, 2001) (comparing the "Countryman test," the "Functional Approach," and legislative history, in lieu of a clear standard in this Circuit). The Court need not here detour through the back roads of competing definitions of executory contracts, because the analysis at the destination remains the same in this case under any definition. "The key ... to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory...." *In re Riodizio, Inc.*, 204 B.R. 417, 421–22 (Bankr.S.D.N.Y.1997) (internal quotations omitted).

■ Section 365 authorizes the debtor to either accept or reject executory contracts. If the debtor accepts an executory contract, then the contract remains operative between the relevant parties and they must continue to perform pursuant to its terms. By contrast, if a debtor rejects an executory contract, then the contract is deemed breached by the debtor as of the date prior to the debtor's bankruptcy filing. *See* 11 U.S.C. 365(g), historical and statutory notes ("The purpose [of the timing provision] is to treat rejection claims as prepetition claims."). The Bankruptcy Code's executory contract provision is in place because "[t]he authority to reject certain contracts is fundamental to the bankruptcy system and provides a mechanism through which severe financial burdens may be lifted while the debtor attempts reorganization." *In re Sun City Investments, Inc.*, 89 B.R. 245, 248 (Bankr. M.D.Fla.1988). Thus, the choice between acceptance or rejection allows a debtor to "relieve the estate of burdensome obligations while ... providing a means whereby a debtor can force others to continue to do business with it when the bank-

ruptcy filing might otherwise make them reluctant to do so." *Frito–Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 954–55 (2d Cir.1993) (internal quotations omitted); *see In re Ionosphere*, 85 F.3d at 998–99 ("A bankruptcy debtor ... is allowed ... to assume an executory contract ... and thereby prevent the other contracting party from terminating the contract."). A party injured by a debtor's rejection of an executory contract "is permitted to file a claim for damages occasioned by the breach under 11 U.S.C. § 502(g)." *In re Sun City*, 89 B.R. at 248.

■ Here, Towers' plan of reorganization was confirmed on December 8, 1994. Defs. Exh. 114. In advance of this confirmation, and, indeed, before the commencement of Towers' bankruptcy proceedings, Hunt Health materially breached the agreements between the parties by terminating early without paying early termination damages, and by keeping payments made on accounts receivable purchased by Towers. These material breaches relieved Towers of its obligations remaining under the contract. Towers, therefore, owed Hunt Health no continuing performance obligations at the time it entered bankruptcy. The objectives of rejection—to relieve the debtor of burdensome obligations while permitting the creditor to relate its claim back to pre-petition—could not be met even had Towers' rejected the HCP Contract, because all that remained of the agreement at the time of bankruptcy was Towers' claims for the repayment of its advances and unpaid factoring fees. The HCP Contract, in other words, did not burden Towers upon its entry into bankruptcy. Moreover its rejection, at that late date, would not have caused a breach upon which Hunt Health could have made a claim. The agreements between the parties, therefore, were not executory.

Defendants' affirmative defense of executory contract does not bar plaintiff's recovery.

In summary, plaintiff prevails on his breach of contract claim by a preponderance of the evidence, and none of the defenses put forward by defendants apply to bar any or all recovery. Before taking up the remaining claims below, the Court pauses to observe that the judgment for defendants' breach of contract, while necessitating the lengthy analysis above, reflects two simple points. First, defendants must simply pay back advances Hunt Health received from Towers for accounts that Hunt Health could not stand behind as good accounts. Second, defendants must simply pay factoring fees owed to plaintiff for Towers' outstanding payments.

## II. Plaintiff's Conversion Claim

Plaintiff's second claim against defendants is for conversion. Plaintiff claims that Hunt Health, by keeping payments totaling $970,724 throughout 1993 on accounts it had sold to Towers, *see supra* I.C.3, converted proceeds to which Towers had the right and possession. Defendants respond that plaintiff's conversion claim is duplicative of his breach of contract claim.

 Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Vigilant Ins. Co. of America v. Housing Authority of El Paso*, 637 N.Y.S.2d 342, 347, 87 N.Y.2d 36, 660 N.E.2d 1121 (1995) (internal quotations omitted); *see Songbyrd, Inc. v. Grossman*, 23 F.Supp.2d 219, 222 (N.D.N.Y.1998). To prevail on a conversion claim a plaintiff must show "(1) that he had a legal ownership interest . . . [in] the property and (2) that the defendant exercised unauthorized interference with the plaintiff's ownership or possession of that property." *Rella v. North Atlantic Marine, Ltd.*, No. 02 Civ.

8573, 2004 WL 1418021, at *5 (S.D.N.Y. June 23, 2004) (internal quotations omitted).

The Court noted in its first summary judgment ruling that the first element of conversion could pose an obstacle to plaintiff in prevailing on his claim. The Court stated, "[Any breach by Towers], if found to be material, may have obviated Hunt Health's obligation to forward proceeds to Towers on accounts and may have justified retention and conversion of those funds. This is so because, pursuant to the HCP Contract, Hunt Health in essence ultimately receives those proceeds back from Towers, less a factoring fee, as at least partial payment for the accounts." *Wechsler*, 1999 WL 397751, at *16. With the bench trial now complete, the Court finds that Towers did not materially breach the contract at any point. *See supra* I.D., I.E.1.a. Towers retained a contractual right at all times to proceeds received on accounts sold to it by Hunt Health, and this right did not cease upon Towers' failure to collect. As Towers had a lawful right to the proceeds on the accounts sold to it, and Hunt Health kept those proceeds, plaintiff satisfactorily makes out a claim for conversion.

 A conversion claim, however, that merely duplicates a breach of contract claim is not actionable. *See Richbell Information Services v. Jupiter Partners*, 765 N.Y.S.2d 575, 590, 309 A.D.2d 288 (1st Dep't 2003) (upholding dismissal of conversion claim that "satisf[ies] the technical elements of that tort" because it was duplicative of the contract claims); *Wolf v. National Council of Young Israel*, 694 N.Y.S.2d 424, 425, 264 A.D.2d 416 (2d Dep't 1999); 23 N.Y. Jur. Conversion § 20 (2004). "For a conversion claim to succeed in the context of a dispute regarding a contract, the breach of contract must result in some 'wrong' that is separately

actionable." *Rella,* 2004 WL 1418021, at *5 (internal quotations omitted). To determine whether contract and conversion claims are distinct, courts look to the legal authority underlying the claims and the damages claimed in each action. *See American Equities Group, Inc. v. Ahava Dairy Prods. Corp.,* No. 01 Civ. 5207, 2004 WL 870260, at *16 (S.D.N.Y. Apr. 23, 2004); *Fabry's S.R.L. v. IFT Intern., Inc.,* 02 Civ. 9855, 2003 WL 21203405, at *3 (S.D.N.Y. May 21, 2003) ("A plaintiff must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights."); *New York Racing Assoc., Inc. v. Meganews, Inc.,* No. 97 Civ. 1091, 2000 WL 307378, at *5 (E.D.N.Y. Mar. 21, 2000) (finding the conversion claim duplicative in part because "it seeks the same damages as are claimed in the contract claim").

Here, the authority upon which plaintiff claims legal ownership of the account proceeds arises from the parties' agreements, from the same terms upon which plaintiff asserts, and prevails upon, his breach of contract claim. The same wrong underlies each action, namely, Hunt Health's retention of proceeds on accounts it had sold to Towers. This retention constitutes a material breach that, among other things, caused Hunt Health's indebtedness to Towers to become immediately due, *see supra* I.E.1.c., and obviated Towers' obligation to collect on accounts, *see supra* I.E.2.c. Hunt Health's retention of proceeds is only unlawful insofar as it constitutes a breach of its agreement with Towers. As plaintiff bases his conversion claim upon this breach, the conversion claim merely duplicates the breach of contract claim. Moreover, as with the breach of contract claim, plaintiff seeks for Hunt Health's conversion the return of proceeds Hunt Health retained on accounts receivable it sold to Towers, up to the amount of advances Towers made. The damages sought by plaintiff confirm that the claims are duplicative, rather than independent.

The Court therefore finds that plaintiff may not recover for conversion.

### III. *Plaintiff's Breach of Guaranty Claim*

Plaintiff also asserts a claim for breach of guaranty claim against defendants. The Court has granted summary judgment to plaintiff that P & G and MHTJ, the signatories of the Guaranties at issue, are jointly, severally and unconditionally liable for any liability of Hunt Health to Towers, and thus Towers' successor in interest, plaintiff. *Wechsler,* 1999 WL 397751, at *23. As the Court now finds defendants liable to plaintiff, the Court reaffirms that P & G and MHTJ are jointly and severally liable to plaintiff for the damages arising from the claims against Hunt Health.

### IV. *Defendants' Breach of Contract Claim*

Defendants counterclaim for breach of contract. Defendants claim that Towers purchased accounts from Hunt Health with $910,870 advances as of February 26, 1993, then failed to pay the balance of these accounts. Defendants contend that plaintiff fails to show that the accounts sold as of February 1993 were non-Reimbursable or Rejected. This failure, defendants contend, necessarily shows that the accounts receivable were Reimbursable Accounts. Pursuant to the HCP Contract, Towers owed the balance of Reimbursable Accounts to Hunt Health upon the earlier of (1) receipt of payment from the Third Party Obligor, (2) 30 days after Towers learns that the Third Party Obligor is insolvent, or (3) 365 days after the date Towers purchases the account. Pl. Exh. 2, ¶ 3. Defendants claim that all of these dates expired without Towers paying the balance of accounts it purchased, thus it its damaged in the amount of that unpaid balance.

Plaintiff moves pursuant to Rule 52(c) for judgment as a matter of law in his favor on defendants' counterclaim. Plaintiff argues that (1) all of the accounts sold as of February 26, 1993, were non-Reimbursable or Rejected, (2) Towers had no obligation to pay the balance of accounts because Hunt Health materially breached and kept incoming payments on those accounts, and (3) defendants offered no evidence in support of their claim.

■ A Rule 52(c) motion made by a defendant may be granted "where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim." *Stokes v. Perry,* No. 94 Civ. 0573, 1997 WL 782131, at *9 (S.D.N.Y. Dec. 19, 1997) (citing Wright & Miller, Federal Practice and Procedure, § 2573.1); *see* Fed.R.Civ.P. 52(c) advisory committee's note; *Burger v. New York Institute of Technology,* 94 F.3d 830, 835 (2d Cir.1996). Unlike under Rule 50 which governs judgment as a matter of law in jury trials, under Rule 52(c), the court does not consider the evidence in the light most favorable to the non-moving party. *In re Regency Holdings,* 216 B.R. 371, 374 (Bankr.S.D.N.Y.1998) (collecting cases). Rather, "the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." *Desiderio v. Celebrity Cruise Lines, Inc.,* No. 97 Civ. 5185, 1999 WL 440775, at *19 (S.D.N.Y. June 28, 1999).

At this stage of the case, Rule 52(c) implies the same inquiry the Court makes to resolve all of the legal and factual matters under Rule 52(a). The Court's consideration of defendants' counterclaim, in other words, is the same under Rules 52(c) and 52(a).

The Court finds that defendants fail to make out a breach of contract claim by a preponderance of the evidence. The Court reaches this finding for two reasons.

First, defendants put on no evidence in support of their counterclaim, instead relying on plaintiff's failure to show that certain accounts receivable were non-Reimbursable or Rejected as affirmative evidence satisfying the preponderance standard. The Court finds above that plaintiff proves that accounts sold to Towers with a face value of $1,903,339 were non-Reimbursable or Rejected, *see supra* I.A.1.a.b., and that plaintiff does not prove that accounts constituting the remainder of the total face value of sold accounts, which was $3,556,048, were non-Reimbursable or Rejected. Contrary to defendants' argument, this finding does not necessarily imply that defendants have shown by a preponderance of the evidence that it sold Reimbursable Accounts to Towers with a face value of $1,652,709. Rather, the record lacks any persuasive evidence about the status of any of the accounts within this subset. Without evidence, the Court must speculate. On the one hand, the ultimate failure of Third Party Obligors to pay on these accounts, even when KMBS attempted to collect, tends to show that the accounts were disputed or denied. On the other hand, the mere transaction of these accounts between Hunt Health and Towers tends to show that they were Reimbursable. Moreover, several possibilities exist for any particular account. For example, its Obligor could be insolvent; its Obligor could be the patient; its Obligor could have paid Hunt Health; its Obligor could acknowledge payment but delay in sending the check. Standing alone, plaintiff's failure to show that a particular possibility correctly describes a particular account does not imply that the account necessarily qualified for sale under the HCP Contract. In short, such speculation, in the absence of any evidence about particular accounts or sets of accounts, is

insufficient to show by a preponderance of the evidence that defendants performed on the contract.

 Second, and more importantly, Hunt Health materially breached the agreements by failing to forward payments to Towers and by terminating the contract early without paying early termination damages. "[A] party's failure to pay pursuant to a contract excuses the other party's obligation to further perform." *Franklin Pavkov Constr. Co. v. Ultra Roof, Inc.,* 51 F.Supp.2d 204, 215 (N.D.N.Y.1999) (citing *Frank Felix,* 111 F.3d at 289); *see NAS Electronics, Inc. v. Transtech Electronics PTE Ltd.,* 262 F.Supp.2d 134, (S.D.N.Y.2003) ("Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract, and the non-breaching party may elect to terminate the contract and sue for damages.").

Here, Hunt Health materially breached the agreements, thereby failing to perform and excusing Towers of its further performance obligations. Hunt Health's material breaches effectively ended the contractual relationship. Towers, without receiving early termination damages, without receiving payments forwarded to Hunt Health on its accounts, without access to Hunt Health's facility to pick up checks, and without information from Hunt Health about which accounts it had collected and which remained outstanding, was not in a position to attempt to mend the contract after Hunt Health's material breaches, and thereafter brought the current action.

Defendants therefore do not satisfy the elements of their breach of contract counterclaim, having failed to show that Hunt Health performed and that Towers committed an unexcused breach that caused damages.

## V. Attorney's Fees, Costs, and Interest

### A. Attorney's Fees and Costs

The Court ruled on summary judgment that "Hunt Health and its guarantors are liable [to pay plaintiff's costs and expenses, including attorney's fees, in connection with his attempts to recover Hunt Health's debts to Towers] in the event Hunt Health is found to owe debts to Towers." *Wechsler,* 1999 WL 397751. As the Court sets forth in its findings of fact and conclusions of law above, Hunt Health owes debts in the amount of $724,075 to Towers, and now Towers' successor in interest, plaintiff, such that plaintiff is entitled to attorney's fees, costs and expenses associated with recovering those debts. The Court finds at this time that defendants owe plaintiff attorney's fees and costs associated with recovering the indebtedness discussed above. The Court reserves decision on the appropriate amount of attorney's fees and costs until it receives submissions from the parties on this limited issue.

### B. Prejudgment Interest

Plaintiff requests prejudgment interest.

 In diversity actions, the awarding of prejudgment interest is considered a substantive issue and is, therefore, governed by state law. *See Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir.1999). New York law provides that "Interest shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y. CPLR § 5001 (McKinney 1992). In an action at law for breach of contract, "prejudgment interest is recoverable as of right." *Trademark Research Corp. v. Maxwell Online, Inc.,* 995 F.2d 326, 342 (2d Cir.1993); *see Barry v. Atkinson,* No. 96 Civ. 84436, 1999 WL 605422, at *9 (S.D.N.Y. Aug. 10, 1999). New York's prejudgment interest rate for breach of contract cases is 9% per annum,

which accrues on a simple, rather than a compound, basis. *See* N.Y. CPLR § 5004; *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir.1998) ("New York courts have held that in a breach of contract action of this sort prejudgment interest must be calculated on a simple interest basis at the statutory rate of nine percent." (citing *Patane v. Romeo*, 235 A.D.2d 649, 652 N.Y.S.2d 142, 144 (3d Dep't 1997); *Kaufman v. Le Curt Constr. Co.*, 196 A.D.2d 577, 601 N.Y.S.2d 186, 187, 188 (2d Dep't 1993))).

Prejudgment interest "shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. CPLR § 5001(b); *see Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir.1994). "Accordingly, where damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway*, 16 F.3d at 512.

Here, the Court awards damages to plaintiff in the amount of $724,075 upon defendants' breach of a contract. Prejudgment interest at a simple rate of 9% is recoverable on these damages. Plaintiff requests interest at an 18% annual rate, without offering support for this calculation. Plaintiff perhaps has the interest provision of paragraph 5 of the HCP Contract in mind. Pl. Exh. 2. As the Court has already found, once an account reaches Rejected Account status, advances on the account become indebtedness owing from Hunt Health to Towers, regardless of subsequent action taken by the parties with respect to the Rejected Account. *Wechsler*, 198 F.Supp.2d at 520. In addition, there are then a variety of ways for both Hunt Health and Towers to proceed, among them, Towers may make a demand for repayment of the advances, and must do so in order to recover interest at 18% from the date of demand, but no time is specified for the demand to be made. *Id.*; Pl. Exh. 2, ¶ 5. Towers never made any notice and demand upon Hunt Health during the parties' contractual relationship or even afterward during 1993. The absence of such a demand, in fact, is what prompted the Court to rule on whether indebtedness on Rejected Accounts arises at all when Towers makes no demand. *Wechsler*, 198 F.Supp.2d at 517, 519 ("Defendants argue that the HCP Agreement requires notice and demand before any indebtedness occurs.... Plaintiff ... contends that the plain language of paragraph 5 creates an automatic indebtedness ... [The Court finds that] formal or affirmative notice by Towers of an account becoming a "Rejected Account" is not a condition precedent to the genesis of an indebtedness owed by Towers to Hunt Health."). Indeed, the absence of any demand by Towers during the contractual relationship for the return of its advances on Rejected Accounts has kindled much of the confusion and dispute during this litigation. Thus, while indebtedness arose automatically from Hunt Health's sale to Towers of Rejected Accounts, the 18% interest rate did not, and it does not now apply to the present calculation of pre-judgment interest. Rather, 9% annual prejudgment interest applies to the damages for breach of contract in this action.

Plaintiff's damages began to accrue at several dates. Some of plaintiff's damages began to accrue before February

26, 1993, when Hunt Health sold non-Reimbursable and Rejected Accounts to Towers in exchange for advance payments. Other of plaintiff's damages became immediately due at least by February 26, 1993, when Hunt Health terminated without paying early termination damages, thereby triggering the acceleration clause. Still other of plaintiff's damages continued to accrue throughout 1993 each month until February 26, 1994, as Hunt Health never made payments for factoring fees that remained outstanding. Amongst this sampling of dates on which plaintiff's causes of action for breach of contract accrued, the Court finds that February 26, 1993, presents the most reasonable date to start computing prejudgment interest.

Plaintiff thus is owed prejudgment interest in the amount of 9% per year, simple rate, beginning as of February 26, 1993, continuing until the date of this judgment. Defendants thus owe plaintiff prejudgment interest in the amount of $746,719.

### Conclusion

As set forth in its findings of fact and conclusions of law above, the Court finds as follows:

(1) As to plaintiff's breach of contract claim, the Court finds for plaintiff. Defendants hereby owe damages to plaintiff in the amount of $724,075 for this claim.

(2) As to plaintiff's conversion claim, the claim is duplicative of plaintiff's breach of contract claim, and the Court finds for defendants.

(3) As to plaintiff's breach of guaranty claim, the Court finds for plaintiff. Defendants Hunt Health, P & G, and MHTJ are jointly and severally liable for the damages, fees, costs, and prejudgment interest awarded in this judgment.

(4) As to defendants' breach of contract counterclaim, the Court finds for plaintiff.

(5) As to plaintiff's request for attorney's fees and costs, the Court finds for plaintiff. The Court reserves decision about the proper amount of attorney's fees and costs plaintiff is entitled until briefing by the parties on the issue is complete.

(6) As to plaintiff's request for prejudgment interest, the Court finds for plaintiff. Defendants hereby owe prejudgment interest to plaintiff in the amount of $746,719.

The Court orders the parties to appear on September 8, 2004, at 9:30 a.m., for a conference to fix the date for the jury trial in this action, and to set the schedule to receive submissions from the parties on the proper amount of attorney's fees owed to plaintiff.

SO ORDERED.